# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 19-60133

United States Court of Appeals
Fifth Circuit

**FILED**

June 18, 2020

Lyle W. Cayce
Clerk

JOSEPH THOMAS; VERNON AYERS; MELVIN LAWSON,

     Plaintiffs - Appellees

v.

TATE REEVES, Governor of the State of Mississippi, all in the official capacities of their own offices and in their official capacities as members of the State Board of Election Commissioners; MICHAEL WATSON, Secretary of State of the State of Mississippi, all in the official capacities of their own offices and in their official capacities as members of the State Board of Election Commissioners,

     Defendants - Appellants

Appeal from the United States District Court
for the Southern District of Mississippi

Before OWEN, Chief Judge, and DAVIS, JONES, SMITH, STEWART, DENNIS, ELROD, HAYNES, HIGGINSON, COSTA, WILLETT, HO, DUNCAN, ENGELHARDT, and OLDHAM, Circuit Judges.[*]

PER CURIAM:

The en banc court unanimously agrees that this court no longer has jurisdiction in this case because it has become moot. It is undisputed that the

---

[*]Judge Leslie H. Southwick and Judge James E. Graves are recused and did not participate in the decision.

No. 19-60133

2019 general election has occurred, and as the State itself emphasized, the current district lines will neither be used nor operate as a base for any future election.

Therefore, the judgment of the district court is vacated, the appeal is dismissed, and the case is remanded to the district court with instructions to dismiss plaintiffs' complaint for lack of jurisdiction. *See U.S. v. Munsingwear, Inc.*, 340 U.S. 36 (1950).

No. 19-60133

GREGG COSTA, Circuit Judge, joined by OWEN, Chief Judge, and DAVIS, STEWART, DENNIS, and HIGGINSON, Circuit Judges, concurring:

The three-judge district court statute traces back more than a century. In its long history, no court has applied the statute unless confronted with a challenge to a law's constitutionality. Mississippi asks our court to be the first.

What is the argument for disrupting the venerable understanding that the extraordinary act of convening a three-judge trial court is limited to constitutional cases? The statute allegedly contains an extra "the." Despite having gone undiscovered for decades in the high-stakes world of voting rights litigation, the unnecessary "the" is supposedly such a glaring problem that it requires us to read a law that contracted the reach of three-judge district courts as one that for the first time extended the use of such courts to statutory cases. An arguably redundant "the" cannot bear that weight. Indeed, when considering Mississippi's argument one cannot help but recall the wisdom of Justice Scalia's vivid point that "[Congress] does not . . . hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

So although I join the per curiam opinion holding that this appeal is now moot, I write to explain why a plain reading of the three-judge statute as well as its ancestry reject the unprecedented notion that statutory challenges to state legislative districts require a special district court.

I.

A.

As always, the starting place is the text. The general three-judge statute states:

> A district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body.

3

No. 19-60133

28 U.S.C. § 2284(a). It doesn't take 30 pages to figure out what the statute says. A person on the street would read it as requiring a three-judge court only for constitutional challenges.

Courts have uniformly given the law that everyday meaning. *See, e.g.*, *Rural W. Tenn. African-Am. Affairs Council v. Sundquist*, 209 F.3d 835, 838 (6th Cir. 2000) (noting reassignment of case to single judge after dismissal of constitutional and Section 5 claims); *Chestnut v. Merrill*, 356 F. Supp. 3d 1351, 1357 (N.D. Ala. 2019) (rejecting argument that a single judge could not hear Section 2 challenge); *Bone Shirt v. Hazeltine*, 336 F. Supp. 2d 976, 980 (D.S.D. 2004) (same as *Rural West*); *Old Person v. Brown*, 182 F. Supp. 2d 1002, 1003 (D. Mont. 2002) (single judge hearing Section 2 challenge). Their reading is consistent with a judge's duty to interpret the statutory language that Congress approved and the President signed by "giving the words used their ordinary meaning." *Levin v. United States*, 568 U.S. 503, 513 (2013).

Against this backdrop, Mississippi offers the avant-garde view that the law also requires three-judge courts for statutory-only challenges to state legislative districts.[1] The novelty of the state's reading does not merely suggest that the question has "gone unasked," Willett Op. 2; it shows that the ordinary meaning of the statute is so clear that nobody ever bothered to ask the question.[2]

---

[1] Before this case, *Chestnut* was the first to entertain an argument similar to the one Mississippi makes. That was just last year. The disputed statutory language has been around more than forty years.

[2] Of course, when a plaintiff brings both constitutional and statutory challenges, the constitutional hook for three-judge courts sweeps in the statutory claim. *See Page v. Bartels*, 248 F.3d 175, 191 (3d Cir. 2001). That makes sense given that section 2284(a) refers to "action[s] . . . filed," not individual claims. 28 U.S.C. § 2284(a). Notably, *Page* repeatedly read section 2284(a)'s "constitutionality of" language to modify "the apportionment of any statewide legislative body." *See* 248 F.3d at 181, 185, 186, 188, 189 (quoting section 2284(a) as requiring a three-judge district court for challenges to "the constitutionality of . . . the

No. 19-60133

And so it is. In common usage, a modifier like "constitutionality of" usually applies to each term in a series of parallel terms. This principle is the series-qualifier canon of construction. *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 147 (2012); *cf. Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920) ("When several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all."). The canon is more of "a matter of common English" than a hard-and-fast rule. *See* SCALIA & GARNER, *supra*, at 147. It describes how people typically speak and write. *See Lockhart v. United States*, 136 S. Ct. 958, 970 (2016) (Kagan, J., dissenting). Consider a recent article in Mississippi's leading newspaper. The article uses a series modifier twice in three sentences when discussing how Mississippi colleges are preparing for football season in the wake of the COVID-19 pandemic. It first refers to "testing all symptomatic athletes and staffers" and then "educat[ing] returning students and employees on new protocols."[3] Any reader would understand that the modifiers—symptomatic and returning—apply to both of the nouns that follow them.

The series-qualifier principle is just a fancy label for describing how a normal person would understand section 2284(a). That is, the modifier "constitutionality of" should apply to both of the parallel terms that follow it:

---

apportionment of any statewide legislative body" (omission in original)). The Third Circuit did not confront the textual argument Mississippi makes today, but its instinctive reading further demonstrates the statute's plain meaning.

[3] Nick Suss & Tyler Horka, *What Needs to Happen for Ole Miss, Mississippi State to Have Fans in Football Stadiums*, MISS. CLARION-LEDGER (May 28, 2020, 2:38 PM), https://www.clarionledger.com/story/sports/college/ole-miss/2020/05/28/ole-miss-msu-give-thoughts-fan-attendance-football-season/5177694002/.

No. 19-60133

(1) challenges to "the apportionment of congressional districts" and (2) challenges to "the apportionment of any statewide legislative body." The canon's intuitive nature explains why the Supreme Court, other courts, and leading treatises have taken that reading as a given. *See, e.g., Harris v. Ariz. Indep. Redistricting Comm'n*, 136 S. Ct. 1301, 1306 (2016) (parenthetically describing section 2284(a) as "providing for the convention of [a three-judge district] court whenever an action is filed challenging the constitutionality of apportionment of legislative districts")[4]; *Armour v. Ohio*, 925 F.2d 987, 989 (6th Cir. 1991) (en banc) (describing the test for section 2284(a) as whether "there exists a non-frivolous constitutional challenge to the apportionment of a statewide legislative body"); 22 JAMES W. MOORE, ET AL., MOORE'S FEDERAL PRACTICE § 404.03[2], at 404-30 to -31 (3d ed. 2019) (explaining that section 2284(a) "is limited to federal constitutional claims"); 17A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 4235, at 202 (3d ed. 2007) (stating that section 2284(a) should apply to "all federal constitutional challenges that could result in a reapportionment").

## B.

Mississippi says this straightforward reading of the three-judge statute is wrong because of a redundant definite article it took more than forty years for anyone to notice. Its argument rests on the statute's use of the word "the" before "apportionment of any state legislative body." That determiner, the state insists, indicates a break in the series modifier, so "constitutionality of" modifies only what immediately follows it: challenges to "the apportionment of congressional districts." Because "constitutionality of" does not also modify the

---

[4] Judge Willett dismisses the Supreme Court's language as dicta. Willett Op. 22 n.82. But the importance of the Court's aside is not its legal force. It instead shows what the natural reading of the statute is when a lawyer is not parsing it to score a win for her client.

"apportionment of any statewide legislative body," the argument goes, then any challenge to state legislative districts—including Plaintiffs' statutory one—requires a three-judge court. Meanwhile, only constitutional challenges to congressional districts would trigger the statute; an ordinary district court would hear statutory attacks on the same target.[5]

That reading creates a more convoluted statutory scheme than the clear-cut distinction between constitutional and statutory claims that lawyers and judges have long understood section 2284(a) to draw. I'll return to that point. For now, I focus on why Mississippi's argument fails as a textual matter.

To be sure, "[t]he typical way in which syntax would suggest no carryover modification" in a series is to repeat a determiner like "the" before one of the series' terms. SCALIA & GARNER, *supra*, at 148. *Reading Law* lists as one example: "*The charitable institutions or the societies* (the presence of the second *the* suggests that the societies need not be charitable)." *Id.* But again, the series-qualifier canon is not a brightline rule to be applied mechanically. "Perhaps more than most of the other canons," it "is highly sensitive to context." *Id.* at 150. And here, the most natural reading of the statute is the

---

[5] Mississippi did not make this argument until the very end of the district court litigation. That would mean it forfeited the argument unless the three-judge statute is jurisdictional. Nonbinding caselaw suggests section 2284(a) is jurisdictional. *See, e.g.*, *LULAC of Tex. v. Texas*, 318 F. App'x 261, 264 (5th Cir. 2009) (per curiam). Yet a leading authority observes that its jurisdictional status is uncertain. WRIGHT ET AL., *supra*, § 4235, at 206–07. The statute's "[a] district court of three judges shall be convened" language sounds mandatory. 28 U.S.C. § 2284(a). But the Supreme Court has emphasized in recent years that not all mandatory procedural rules are jurisdictional, and the distinction often turns on whether Congress describes the requirement as jurisdictional. *See, e.g., Fort Bend Cty. v. Davis*, 139 S. Ct. 1843, 1849–50 (2019). The word "jurisdiction" does not appear in section 2284(a). And the statute says that the procedure for convening a three-judge court begins "[u]pon the filing of a request for three judges." 28 U.S.C. § 2284(b)(1). If section 2284(a) imposes a jurisdictional requirement, a district judge would be obligated to convene a three-judge court regardless of whether a party asked for one. So I have serious doubts that the statute is jurisdictional, but I nonetheless address the merits of the argument.

long-accepted interpretation that "constitutionality of" modifies both kinds of apportionment challenges.

Most importantly, the use of "the" before each parallel term would not cut off the modifier "constitutionality of" in everyday English.  At the risk of overdoing analogies to the sports pages, consider the hypothetical newspaper line from the motions panel opinion: "The NCAA is investigating the recruiting practices of the football program and the basketball program."  *Thomas v. Bryant*, 919 F.3d 298, 306 (5th Cir. 2019).  As with the three-judge statute, the last "the" may not be necessary.  But no reader would understand that last "the" to mean that the investigation into the football program is limited to recruiting violations while the investigation into the basketball program might also look into point-shaving or ticket-scalping violations.  *See* SCALIA & GARNER, *supra*, at 176–77 (explaining that drafters sometimes repeat themselves and add words that serve no legal function).

Judge Willett acknowledges that the commonsense reading of this sentence is that "the recruiting practices of" applies to both sports. Willett Op. 7.  But he suggests the way we read "informal, everyday phrasing" in a newspaper is different than how we should read "formal, statutory phrasing" in the law.  *Id.* at 9.  Justice Story thought otherwise:

> Constitutions are not designed for metaphysical or logical subtleties, for niceties of expression, for critical propriety, for elaborate shades of meaning, or for the exercise of philosophical acuteness or judicial research.  They are instruments of a practical nature, founded on the common business of human life, adapted to common wants, designed for common use, and fitted for common understandings.  The people make them; the people adopt them; the people must be supposed to read them, with the help of common sense; and cannot be presumed to admit in them any recondite meaning, or any extraordinary gloss.

No. 19-60133

JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES 157–58 (1833). So did Justice Scalia. *Reading Law* explains that words in all legal instruments "are to be understood in their ordinary, everyday meanings." SCALIA & GARNER, *supra*, at 69. This command to follow ordinary meaning is not just one among the many rules of statutory interpretation. It is "the most fundamental semantic rule of interpretation." *Id.* Indeed, the notion that there are special, lawyers-only grammar rules for reading statutes is at odds with the principle that, in a democracy, laws should be easily understood by the people they govern. *See generally* Note, *Textualism as Fair Notice*, 123 HARV. L. REV. 542 (2009); *cf. Sessions v. Dimaya*, 138 S. Ct. 1204, 1225–26 (2018) (Gorsuch, J., concurring in part and concurring in the judgment) ("Perhaps the most basic of due process's customary protections is the demand of fair notice," *id.* at 1225).

Yet Judge Willett says that the statute's "particular grammatical construction" sets it apart from the newspaper line, so it requires more legalistic scrutiny. Willett Op. 10. But is it so unusual that ordinary people would not understand it? Take a look at the earlier example from *Reading Law*: "The charitable institutions or the societies." SCALIA & GARNER, *supra*, at 148. That sentence's natural reading is that "charitable" applies only to "institutions." The reason is that the modifier "charitable" appears between the first "the" and that determiner's noun, "institutions." Because there is no corresponding modifier between "societies" and its determiner, it is clear that no modifier applies to "societies." But the example's structure is different than that of the three-judge statute. Imagine it instead mirrored the statute's "constitutionality of" structure: "The charity of the institutions or the societies." An unusual construction, but not an ambiguous one. A reader would assume that "charity" modifies both "institutions" and "societies." The

9

No. 19-60133

difference is that, in this variant, the modifier precedes both parallel terms and their determiners.[6] So too with the three-judge statute.[7]

## C.

Mississippi makes a second unconvincing textual argument. It asserts that another canon subverts the natural reading of the statute that the series-qualifier canon confirms: the canon against surplusage. That canon advises that "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (cleaned up) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)). Mississippi points out that, if the three-judge statute applied to constitutional challenges against both apportionment of congressional districts and statewide legislative bodies, its second use of the phrase "the apportionment of" would be unnecessary. The statute could have the same meaning if it read as follows:

> A district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the

---

[6] Some of *Reading Law*'s other examples have similar analogues. Take the sentence: "*A solid wall or a fence.*" SCALIA & GARNER, *supra*, at 149. The determiner "a" cuts off the modifier "solid," so "the fence need not be solid." *Id.* But change it to follow the structure of section 2284(a): "The solidity of a wall or a fence." Another unusual sentence structure. Yet no lay reader would think "solidity" modified only "wall."

[7] Some markups illustrate the point. They emphasize the modifier, number the parallel terms, and underline the parallel terms' determiners.

- Original *Reading Law* Example—
    [1] The ***charitable*** institutions or [2] the societies.

- *Reading Law* Variant—
    The ***charity of*** [1] the institutions or [2] the societies.

- Section 2284(a)—
    [T]he ***constitutionality of*** [1] the apportionment of congressional districts or [2] the apportionment of any statewide legislative body.

10

apportionment of congressional districts or ~~the apportionment of~~ any statewide legislative body.

That is true.  But once again Mississippi treats a canon meant to describe how people typically speak and write like an uncompromising rule.  As our full court recently emphasized, "the canon against surplusage yields to context as it expresses courts' *general* reluctance to treat statutory terms as surplusage." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 294 (5th Cir. 2020) (en banc) (cleaned up) (quoting *Bd. of Trs. of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 563 U.S. 776, 788 (2011)).  That general reluctance "does not require us to avoid surplusage at all costs."  *United States v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007).

We sometimes accept a little surplusage because we acknowledge that the canon's premise—that legislators do not include in statutes words that have no effect—"is not *invariably* true."  SCALIA & GARNER, *supra*, at 176. "Sometimes drafters *do* repeat themselves and *do* include words that add nothing of substance . . . ."  *Id.* at 176–77.  Repetition and parallelism are features of how ordinary people—and extraordinary ones—speak and write. *See, e.g.*, Abraham Lincoln, Gettysburg Address (Nov. 19, 1863) ("[G]overnment of the people, by the people, for the people, shall not perish from the earth.").  So when all other indicators support a plain reading of a statute, we will not let minor repetition steer us toward a farfetched one.  And that is exactly what Mississippi asks us to do here: throw out a longstanding, commonsense construction of the three-judge statute just to avoid making a short phrase redundant.

Besides, Mississippi's view of section 2284(a) suffers from surplusage too.  If "constitutionality of" modifies only "the apportionment of congressional

districts," then the statute's second "the" becomes unnecessary. We could strike it out and the statute would carry the same meaning:

> A district court of three judges shall be convened when . . . an action is filed challenging the constitutionality of ~~the~~ apportionment of congressional districts or the apportionment of any statewide legislative body.

In fact, by using just one determiner before each type of suit, that version of the statute would more clearly delineate between those suits and better support Mississippi's position. But Congress chose to include that second "the." So as it turns out, both parties' readings leave the statute with an extra "the." Faced with two interpretations that each contain some surplusage, we should give the statute its natural meaning.

Statutory interpretation is not a lawyer's game to "divine arcane nuances" and "discover hidden meanings." *See* SCALIA & GARNER, *supra*, at 69; *see also id.* at 177 (explaining that a "clever interpreter" can abuse the canon against surplusages by "creat[ing] unforeseen meanings or legal effects" from "stylistic" repetition). Our duty instead is to follow the natural, everyday meaning of the words enacted into law. *Id.* at 33 ("The interpretive approach we endorse is that of the 'fair reading': determining the application of a governing text to given facts on the basis of how a reasonable reader, fully competent in the language, would have understood the text at the time it was issued."). The plain reading of the three-judge statute is that it applies only to suits alleging that a law is unconstitutional. Calling the contested "the" a textual mousehole is being generous.

No. 19-60133

II.

Even if an extra definite article opens the door ever so slightly to some ambiguity, section 2284(a)'s statutory history slams it back shut.[8]  A brief primer on the three-judge statute shows just how transformative Mississippi's interpretation would be.

Congress first enacted the three-judge statute in the aftermath of *Ex parte Young* to require three judges to hear what it predicted would be an increasing number of suits challenging state laws "upon the ground of the unconstitutionality of such statute."  28 U.S.C. § 2281 (1970); *see generally* David P. Currie, *The Three-Judge District Court in Constitutional Litigation*, 32 U. CHI. L. REV. 1, 5–8 (1964).  When courts later struck down many New Deal reforms, one of the only aspects of President Roosevelt's court-packing plan to become law was a measure also requiring three-judge panels for suits seeking to enjoin "any Act of Congress for repugnance to the Constitution of the United States."  28 U.S.C. § 2282 (1970); *see* 17A WRIGHT ET AL., *supra*, § 4234, at 194–95.  Both laws' focus on only constitutional challenges made sense because striking down democratically enacted laws is "the gravest and most delicate duty" courts are "called on to perform."  *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 204 (2009) (quoting *Blodgett v. Holden*, 275 U.S. 142, 147–48 (1927) (Holmes, J., concurring)).  The idea behind requiring three judges for this "class of cases of special importance" was to "assure more weight and greater deliberation by not leaving the fate of such litigation to a single judge."  *Phillips v. United States*, 312 U.S. 246, 249–50 (1941) (first quotation from *Ex parte Collins*, 277 U.S. 565, 567 (1928)); *see also*

---

[8] Judge Willett agrees that statutory history—as opposed to more controversial legislative history—can illuminate a statute's meaning.  *See* Willett Op. 13 n.45.

*Swift & Co. v. Wickham*, 382 U.S. 111, 118 (1965) (explaining that Congress introduced the three-judge procedure because "if three judges declare that a state statute is unconstitutional the people would rest easy under it" (quoting 45 CONG. REC. 7256 (1910) (statement of Sen. Overman))).

But in the mid-1970s, Congress scrapped most of the three-judge district court regime because it was burdening the Supreme Court as well as lower courts and had resulted in procedural complexities. *See* 17A WRIGHT ET AL., *supra*, § 4234, at 195–98; *see also Kalson v. Paterson*, 542 F.3d 281, 287 (2d Cir. 2008) (noting that the 1976 Act "vastly reduced the category of cases for which a three-judge court is mandated"). It nonetheless retained the procedure for a small set of important cases: constitutional challenges to redistricting for congressional and state legislative seats, then-recent phenomena in the aftermath of the revolutionary one person, one vote line of cases. *See, e.g., Reynolds v. Sims*, 377 U.S. 533 (1964).

Congress was thus narrowing the reach of the three-judge statute when it added the current language. It is implausible (to put it mildly) that while otherwise contracting the statute, Congress decided to expand it beyond constitutional challenges for the first time. Indeed, neither Mississippi nor Judge Willett explain why a law shrinking the three-judge statute should be read to enlarge it. That unplugged hole in their argument is especially damaging considering that Congress's "one reason" for creating three-judge courts was "to save state and federal statutes from improvident doom, *on constitutional grounds*, at the hands of a single federal district judge." *Gonzalez v. Automatic Emp. Credit Union*, 419 U.S. 90, 97 (1974) (emphasis added). It is particularly hard to believe that Congress would have made such a significant and discordant change by merely adding an extra "the."

Reading the statute in the way Mississippi urges does not make sense for another reason: Why would Congress require three judges to hear statutory claims challenging state legislative redistricting but not congressional redistricting?  Federalism concerns cannot explain the difference.  While a state of course has a strong interest in how it apportions its legislature, it also has a strong interest in choosing how to divvy up its citizens into congressional districts.  In fact, contemporary critics of the initial judicial foray into review of legislative apportionment viewed courts' redrawing of congressional districts as more intrusive on traditional state prerogatives than judicial redrawing of state legislative districts.  That is because of the view that Article I of the Constitution grants "States . . . plenary power to select their allotted Representatives in accordance with any method of popular election they please, subject only to the supervisory power of Congress."  *Wesberry v. Sanders*, 376 U.S. 1, 23 (1964) (Harlan, J., dissenting).

There is a further problem with concluding that the 1976 Congress extended three-judge courts to cover statutory challenges: such claims were not common then.  It was not established in the 1970s that Section 2 of the Voting Rights Act provided a private right of action.  *See City of Mobile v. Bolden*, 446 U.S. 55, 60 (1980) (assuming without deciding such a suit could exist).  A few years later, the Supreme Court held Section 2 did not prohibit discriminatory effects, which meant it provided no guarantee beyond what the Constitution already did.  *See id*.  And the typical pre-1982 Section 2 claim that courts did consider was a challenge to at-large electoral systems, not the drawing of single member districts.  *See, e.g., id*.  In other words, there was no

practice of statutory challenges to state legislative apportionment that Congress needed to address in 1976.[9]

Judge Willett and I agree on this history, but we differ on the takeaway. *See* Willett Op. 13–17. I draw this lesson: Congress would not have used an extra "the" to distinguish between constitutional and statutory apportionment challenges when the latter kind of action was not even on its radar screen. The idea that we should extend the three-judge statute to statutory challenges because the 1976 Congress would have wanted that if only it had known what the future held does not treat text as "the alpha and the omega" of statutory interpretation. Willett Op. 1. Instead, the text fits neatly with what the historical backdrop suggests. The Congress amending the three-judge statute would have been focused only on constitutional challenges.

To sum up, Mississippi would give this much weight to the "the" that comes before "reapportionment of any statewide legislative body": Insertion of that article would require three-judge panels for exclusively statutory claims—followed by direct appeal to the Supreme Court, 28 U.S.C. § 1253—when the three-judge regime Congress was paring down in 1976 never did. It would require those three-judge panels only for statutory challenges to apportionment of state legislative seats, not congressional ones. And it would do all this to address statutory challenges to apportionment of state legislatures when those claims hardly existed in 1976. An elephant indeed.

---

[9] While Section 5 of the Voting Rights Act provided a statutory cause of action, it already included its own three-judge district court requirement. 42 U.S.C. § 1973c (1976).

No. 19-60133

III.

We are now beyond belts and suspenders. The ordinary meaning of the three-judge statute is the interpretation every court has given it. And the statute's history reinforces that it covers only constitutional challenges.

But even if the text of three-judge statute remains a "brain teaser," Willett Op. 10, open to more than one "plausible reading," *id.* at 29, the Supreme Court has told us how to solve the puzzle.[10] The tiebreaker is a "canon of narrow construction" for three-judge court statutes. *Gonzalez*, 419 U.S. at 98 ("[W]e have stressed that the three-judge-court procedure is not 'a measure of broad social policy to be construed with great liberality.'" (quoting *Phillips*, 312 U.S. at 251)). It reflects concerns over the "serious drain" that three-judge district courts have on the judiciary's resources as well as the impact of an automatic appeal on the Supreme Court docket. *Phillips*, 312 U.S. at 250. One treatise observed that those concerns were so pronounced in the 1960s and 1970s that Justice Frankfurter's articulation of the strict construction principle in *Phillips* became "the Court's favorite quotation." 17A WRIGHT ET AL., *supra*, § 4234, at 197 (collecting cases).

This rule of construction no longer appears with such frequency. But reduced citations do not allow us to jettison Supreme Court precedent. *See Ramos v. Louisiana*, 140 S. Ct. 1390, 1416 n.5 (2020) (Kavanaugh, J., concurring) ("[F]ederal courts have a constitutional obligation to follow a precedent of this Court unless and until it is overruled by this Court."); *cf. Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case, yet appears to rest

---

[10] *See also Thomas v. Bryant*, 938 F.3d 134, 176 (5th Cir. 2019) (Willett, J., dissenting) (describing Mississippi's argument as "more confounding than convincing"); *id.* at 190 ("As for the knotty jurisdictional question, I concede uncertainty.").

17

No. 19-60133

on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions."). *But see* Willett Op. 21–22 (questioning the continued application of the canon because the concerns that motivated it are no longer as salient). Because it is still on the books, the rule of narrow construction resolves this case even if Mississippi's argument has cast any doubt on the widely accepted meaning of the law.

\* \* \*

The plain meaning of the statute's text, uniform caselaw applying the statute, the statutory history, and the rule that three-judge statutes should be construed narrowly all favor the district court's view that three judges are not required for a suit raising only statutory challenges to state legislative districts. To come to Mississippi's contrary and unprecedented conclusion would require us to wrench an elephant out of the tiniest of mouseholes.

18

No. 19-60133

DON R. WILLETT, Circuit Judge, joined by SMITH, ELROD, DUNCAN, and ENGELHARDT, Circuit Judges, concurring in the judgment:

The en banc court is unanimous on the "what"—vacate the district court's judgment. But we have assorted views on the "why."

Vacatur is the correct result, but for more than one reason. Putting aside mootness (lack of a live controversy), there exists a separate problem (lack of jurisdiction). The most forthright, text-centric reading of 28 U.S.C. § 2284(a) is that a three-judge district court is required to decide apportionment challenges—both statutory and constitutional—to statewide legislative bodies. The *wording* of § 2284(a) may be imprecise. But its *meaning*—when read in the light of blackletter syntactic and contextual canons—manifestly favors the State.

I

"Text is the alpha and the omega of the interpretive process."[1] And as this is fundamentally a statutory-construction case, we begin (and end) with the actual language that Congress chose.[2] Section 2284(a) states:

> A district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body.

---

[1] *United States v. Maturino*, 887 F.3d 716, 723 (5th Cir. 2018).

[2] *See Weatherly v. Pershing, L.L.C.*, 945 F.3d 915, 921 (5th Cir. 2019) ("[W]hen a statute controls, our first stop (and usually our last) is the statutory text."); *United States v. Lauderdale County*, 914 F.3d 960, 964 (5th Cir. 2019) ("The task of statutory interpretation begins and, if possible, ends with the language of the statute.").

No. 19-60133

A divided merits panel labeled these words "clear."[3] A divided motions panel said they had a "natural reading."[4] If only.

Section 2284(a) is not a paradigm of precision. It is inartfully worded, and divining its meaning requires painstaking study. Our circuit is the first to confront the issue, not because the answer is obvious, but because the question has gone unasked—until now. Now raised, the question has managed to divide 16 federal circuit judges with hundreds of years of combined judicial experience, sitting first as a motions panel, then as a merits panel, and now en banc. The issue may be elemental—whether "constitutionality" modifies the second phrase in the sentence—but it is anything but elementary. It's a vexing issue open to good-faith debate.

Here are the two competing interpretations:

> *__Option A (Thomas)__*—**a three-judge court is required to decide:**
>
> (1) the constitutionality of the apportionment of congressional districts; or (2) the constitutionality of the apportionment of any statewide legislative body.

Upshot: Only *constitutional* challenges to state and federal legislative maps require three judges; purely statutory disputes can be heard by a single judge.

> *__Option B (the State)__*—**a three-judge court is required to decide:**
> (1) the constitutionality of the apportionment of congressional districts; or (2) the apportionment of any statewide legislative body.

---

[3] *Thomas v. Bryant*, 938 F.3d 134, 145 (5th Cir. 2019) ("The text of § 2284(a) is clear, so we apply the statute as written."), *reh'g granted en banc*, 939 F.3d 629 (5th Cir. 2019).

[4] *Thomas v. Bryant*, 919 F.3d 298, 306 (5th Cir. 2019) (determining that "context supports the natural reading that courts have long given [§ 2284(a)]").

No. 19-60133

Upshot: *All* challenges, both constitutional and statutory, to *state* maps require three judges—but only *constitutional* challenges to *federal* maps require three judges.

The core interpretive question is simply stated: Does "constitutionality of" in § 2284(a) carry over to modify "the apportionment of any statewide legislative body"? Thomas says yes, meaning a single judge could decide his purely statutory challenge. The State says no, meaning three judges were required. Here, the State requested a three-judge court, and the district court refused, concluding that it could decide a standalone section 2 claim.

Language is often slippery, particularly legislative language. Chief Justice Marshall famously made the point 201 years ago: "Such is the character of human language, that no word conveys to the mind, in all situations, one single definite idea . . . ."[5] Section 2284(a)'s phrasing is inexact. But its meaning backs the State: "constitutionality of" does *not* carry over. Admittedly, this is not the only possible reading, but it is the most textually plausible one.

A

Litigants in our adversarial system are loath to concede imprecision, insisting forcefully, if not always convincingly, that the statutory text "plainly" or "clearly" cuts their way. Here, each side insists that § 2284(a) has an inescapably unambiguous reading—the one that favors their side.

The lion's share of twenty-first century appellate judging is reading legislative language and deciding what it means. In today's statute-laden era, *how* we decide—legisprudence: the jurisprudence of legislation[6]—is as weighty

---

[5] *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 414 (1819).

[6] *Legisprudence*, BLACK'S LAW DICTIONARY 1040 (10th ed. 2014) ("The systematic analysis of statutes within the framework of jurisprudential philosophies about the role and nature of law.").

as *what* we decide. Methodology matters. So we must be mindful of our duty to behave judicially by adjudicating and not politically by legislating. "Our Constitution's ingenious architecture demands that judges be sticklers when decoding legislative text."[7] Sticklers about not revising statutes under the guise of interpreting them. Sticklers about not extolling judicial guesswork over legislative handiwork. Sticklers about respecting a constitutional design that, when conferring and confining power, leaves lawmaking to lawmakers. "The law begins with language, and the foremost task of legal interpretation is divining what the law *is*, not what the judge-interpreter *wishes* it to be."[8] Principled, no-favorites textualism means tying oneself to the mast.

All to say, textual interpretation demands unswerving fidelity to text. "Judges are minders," after all, "not makers or menders."[9] True, statutory language is now and again imprecise—sometimes inadvertently, sometimes intentionally. And while judges don't have, and rarely need, secret decoder rings to decrypt legislative text, we routinely use various tools to glean meaning. "Statutory language, like all language, is suffused with age-old interpretive conventions. And judges, like all readers, must be attentive not to words standing alone but to surrounding structure and other contextual cues that illuminate meaning."[10]

Time-honored canons of interpretation can help, provided the canons esteem *textual* interpretation. True, the canons are not inexorable commands,

---

[7] *Reed v. Taylor*, 923 F.3d 411, 415 (5th Cir. 2019).

[8] *Id.*

[9] *Id.*

[10] *Id.*; *see also United States v. Graves*, 908 F.3d 137, 141 (5th Cir. 2018) ("[T]ext may not be divorced from context." (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 356 (2013))).

No. 19-60133

but neither are they window dressing. They are venerable interpretive presumptions about what smartly produced language means. The canons exist to clarify meaning, not to cloak it. And no canon, however esteemed, can defeat the obvious, non-absurd meaning of clearly drafted text. In this case, however, the text is anything but clearly drafted. And as we try to solve the statutory puzzle, some familiar canons, both syntactic and contextual, reveal § 2284(a)'s semantic import. Notably, the canons point in the same interpretive direction, underlining rather than undermining. This is not a Battle of the Canons case pitting competing doctrines against each other. Here, we are not picking between discordant canons; we are stacking harmonious ones.

B

Batting leadoff today, the series-qualifier canon.[11]

The series-qualifier canon is a syntactic canon that looks to the grammatical arrangement of words in a sentence. Specifically, when does a modifier apply to a parallel series, and when does it not? The general rule: "When there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier normally applies to the entire series."[12] Consider these case examples, gathered in *Reading Law*:

- *Charitable institutions or societies* (*charitable* modifies both *institutions* and *societies*).

- *Internal personnel rules and practices of an agency* (*internal personnel* modifies both *rules* and *practices*).

- *Intoxicating bitters or beverages* (*intoxicating* modifies both *bitters* and *beverages*).

---

[11] *See generally* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW § 19 (2012).

[12] *Id.* § 19, at 147.

No. 19-60133

- *Forcibly assaults, resists, opposes, impedes, intimidates, or interferes with* (*forcibly* modifies each verb in the list).

- *Willfully damage or tamper with* (*willfully* modifies both *damage* and *tamper with*).[13]

But there's an important caveat to this carryover rule, one we recently applied.[14] No carryover modification is suggested when "a determiner (*a*, *the*, *some*, etc.) [is] repeated before the second element."[15] Justice Scalia and lexicographer Garner provide some no-carryover illustrations:

- *The charitable institutions or the societies* (the presence of the second *the* suggests that the societies need not be charitable).

- *A solid wall or a fence* (the fence need not be solid).

- *Delaware corporations and some partnerships* (the partnerships may be registered in any state).

- *To clap and to cheer lustily* (the clapping need not be lusty).[16]

Now let's return to our statute, § 2284(a): "the constitutionality of the apportionment of congressional districts or *the* apportionment of any statewide legislative body."[17] The determiner "the" (or, perhaps more precisely, the determining phrase "the apportionment") sets the last phrase apart, indicating that § 2284(a) requires three judges for *all* apportionment challenges to state maps, not just constitutional challenges.

The district court cited the series-qualifier canon but misapplied it, inexplicably failing to even *acknowledge* § 2284(a)'s crucial determiner. The

---

[13] *Id.* § 19, at 148.

[14] *United States ex rel. Vaughn v. United Biologics, L.L.C.*, 907 F.3d 187, 195 (5th Cir. 2018) (quoting SCALIA & GARNER, *supra* note 11 § 19, at 148) ("The typical way to break the series is to insert a determiner.").

[15] SCALIA & GARNER, *supra* note 11 § 19, at 148.

[16] *Id.* § 19, at 148–49.

[17] 28 U.S.C. § 2284(a) (emphasis added).

motions panel majority declined to apply the series-qualifier canon at all, lamenting (accurately) that the canon is "highly sensitive to context."[18] And the motions panel determined that context here supports a "natural reading," claiming that its reading of the statute (that "constitutionality of" carries over) is how "ordinary people speak and write."[19] To bolster its position, the motions panel offered this illustration:

> [C]onsider what a reader would think after seeing the following in the newspaper: 'The NCAA is investigating the recruiting practices of the football program and the basketball program.' As with the three-judge statute, the final 'the' may not be necessary. But would it make the reader think the investigation into the basketball program is not limited to recruiting violations . . . ?[20]

We do not disagree. But if anything, the NCAA illustration (which tellingly uses a different structure from the one in § 2284(a)) simply bears out a commonsensical and utterly uncontroversial notion: Interpretation is a human enterprise, and no canon, including the series-qualifier canon, can override the self-apparent meaning of written words. Sometimes, as in the NCAA example, plain text is plain enough.

---

[18] *Thomas*, 919 F.3d at 306. The merits panel majority determined that the series-qualifier canon, "even if applicable," confirmed its reading of the statute. *Thomas*, 938 F.3d at 146. It supported this position only by suggesting that the canon's exception for determiners shouldn't be applied because the canon is (as everyone agrees), "highly sensitive to context." *Id.* But that's no reason to skirt the exception. Scrupulous concern for a text's full meaning requires scrupulous application of the full canon, not just the snippet that reinforces one's preferred interpretation.

[19] *Thomas*, 919 F.3d at 306. (citing *Lockhart v. United States*, 136 S. Ct. 958, 970 (2016) (Kagan, J., dissenting). The majority cited to Justice Kagan's dissent in *Lockhart*, but ironically, Justice Kagan was urging the application of the series-qualifier canon, not its rejection—precisely because the canon "reflects the completely ordinary way that people speak and listen, write and read." *Lockhart*, 136 S. Ct. at 970 (Kagan, J., dissenting). That's no less true when the statute contains a determiner.

[20] *Thomas*, 919 F.3d at 306.

No. 19-60133

Used properly, the canons are neutral guides to reveal, not conceal, meaning. "Often the sense of the matter prevails,"[21] and no sensible user of English believes the canons should contort obvious meaning. As the NCAA example is utterly clear on its face, no canons are needed to divine its meaning. The gist of the language is instantly clear to the relevant linguistic community. But § 2284(a) is hardly intuitive. It simply doesn't have an obvious, self-evident meaning and is capable of two distinct readings.[22] So we look to syntactic and contextual canons, the shared background conventions that provide linguistic context, to help choose among competing interpretations.[23]

---

[21] SCALIA & GARNER, *supra* note 11 § 19, at 150.

[22] But notably, only one reading (Thomas's) requires the deletion or insertion of words. Thomas would either subtract words so that the statute reads this way:

"A district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts or ~~the apportionment~~ of any statewide legislative body."

Or he would add words so that the statute reads this way:

"A district court of three judges shall be convened . . . when an action is filed challenging the constitutionality of the apportionment of congressional districts or the [constitutionality of the] apportionment of any statewide legislative body."

The former alteration treats part of the statute as surplusage. *See infra* I(C). And the latter alteration collides with the Supreme Court's admonition, recently (and unanimously) reaffirmed, that judges "may not narrow a provision's reach by inserting words Congress chose to omit." *Lomax v. Ortiz-Marquez*, No. 18-839, 2020 WL 3038282, at *3 (U.S. June 8, 2020).

[23] Judge Costa's opinion accuses us of employing "special, lawyers-only grammar rules for reading statutes." Costa Op. at 7. But the linguistic canons are not "special, lawyers-only grammar rules." The canons are traditional tools of interpretation routinely applied by both the Supreme Court and by this court. Interestingly, Judge Costa's opinion uses the same canons we do. Moreover, he attacks a strawman. He scolds us for resorting to canons rather than following the "natural" or "everyday" meaning of the text. But there is no disagreement over what to do when faced with text whose obvious sense is immediately clear. Our disagreement is simply over whether § 2284(a) is such a text. Readers can compare the language of § 2284(a) with Judge Costa's NCAA example and decide for themselves if § 2284(a) likewise carries such a "commonsense," ordinary, and self-apparent meaning.

No. 19-60133

This approach accords with the principle that words "are to be understood in their ordinary, everyday meanings."[24] First, we start with the plain meaning of the text, and if it's obviously a spade, we call it a spade. But sometimes obviousness doesn't work. When it's unclear whether it's a spade or a mattock, we consult the canons. If the canons also prove unavailing, and we've made every effort to discern the meaning, then the statute is ambiguous. Only then, after plain meaning *and* application of the interpretive canons are found lacking, do the so-called *substantive* canons (here, "strict construction" against three-judge panels, which I'll return to later) come into play.

This is precisely what a unanimous Supreme Court did earlier this year in *Shular v. United States*.[25] Considering the rule of lenity, the Court explained that the substantive canon "applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute."[26] Of course, the canons of construction—linguistic, substantive, or otherwise—cannot trump plain statutory language. But if a statute is not clear on its face—if the ordinary meaning is not immediately self-apparent—then the canons can help decipher the most textually plausible reading. Indeed, the law is rich in interpretive conventions.[27] And in the realm of public lawmaking, when judges

---

Because we believe § 2284(a) isn't instantly and facially self-evident, we consult the linguistic canons for guidance.

[24] SCALIA & GARNER, *supra* note 11 § 6, at 69.

[25] 140 S. Ct. 779 (2020).

[26] *Id.* at 787 (quoting *United States v. Shabani*, 513 U.S. 10, 17 (1994)).

[27] *See* SCALIA & GARNER, *supra* note 11, at xxvii ("In legal systems, there are linguistic usages and conventions distinctive to private legal documents in various fields and to governmental legislation. And there are jurisprudential conventions that make legal interpretation more than just a linguistic exercise.").

No. 19-60133

are grappling with enacted texts, linguistic canons apply commonsensical rules of syntax to help us decode the meaning of language.[28]

Back to the motions panel's NCAA example, which uses informal, everyday phrasing to smuggle in an assumed "natural" reading of formal, statutory phrasing. This is classic question-begging. The premise (the canon is inapplicable when the text is clear) assumes the truth of the conclusion (the text is clear). But unlike the NCAA example, whose sense is a no-brainer, § 2284(a) isn't run-of-the-mill, colloquial speech whose meaning is instantly obvious. Its particular grammatical construction makes it a statutory brain teaser, even for seasoned judges. And in such cases, we consult the linguistic canons, salutary rules of thumb about how people use language.

The series-qualifier canon ought to be applied—together with its critical "determiner" exception. We recently (and correctly) applied the canon—determiner and all—in *Vaughn*, holding that a determiner divided a statute into discrete parts, thus revealing its "correct and more natural" reading.[29] So too here. The precise syntax of § 2284(a) indicates no carryover: A three-judge court is required for all apportionment challenges to state maps.

C

But the series-qualifier canon isn't the *only* relevant interpretive canon. The surplusage canon, a contextual canon, also applies. And notably, while it is true that one canon may be subject to defeasance by another, here, both the series-qualifier canon and the surplusage canon point in the same direction. The inferences drawn are not competing, but complementary.

---

[28] Amy Coney Barrett, *Substantive Canons and Faithful Agency*, 90 B. U. L. REV. 109, 117 (2010).

[29] *Vaughn*, 907 F.3d at 195.

No. 19-60133

The surplusage canon, lauded as a "cardinal principle of statutory construction" by the Supreme Court,[30] teaches "it is no more the court's function to revise by subtraction than by addition."[31] In other words, every word should be given effect, and none should be read to duplicate another provision or to have no consequence. Because we presume that legal drafters don't include words that have no effect, we "avoid a reading that renders some words altogether redundant."[32] The surplusage canon has a sterling pedigree in the Supreme Court[33] and in this court.[34] And as the motions panel conceded, the canon is implicated here because Thomas's reading renders the phrase "the apportionment" meaningless.[35] Thomas blue-pencils the statute to require a three-judge panel only when a suit challenges:

> the constitutionality of the apportionment of congressional districts or ~~the apportionment~~ of any statewide legislative body.

Thomas avers that "the apportionment" "is simply a few redundant words." But that's precisely what the surplusage canon seeks to avoid, the notion that Congress's words can be deemed idle, pointless, or nonoperative. It's the business of courts to take lawmakers at their word, and to presume they meant what they said. On this vital point, the Supreme Court has been

---

[30] *Bennett v. Spear*, 520 U.S. 154, 173 (1997).

[31] SCALIA & GARNER, *supra* note 11 § 26, at 175.

[32] *Id.*

[33] *Nat'l Ass'n of Mfrs. v. Dep't of Def.*, 138 S. Ct. 617, 632 (2018) ("As this Court has noted time and time again, the Court is 'obliged to give effect, if possible, to every word Congress used.'") (quoting *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979)).

[34] *Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 133 (5th Cir. 2018) (describing the canon as a "cardinal principle of statutory construction") (quoting *Bennett*, 520 U.S. at 173).

[35] *Thomas*, 919 F.3d at 305 n.5.

No. 19-60133

unsubtle: "[W]e must give effect to every word that Congress used in the statute."[36]

Thomas also insists, quoting Justice Thomas, that we need not "avoid surplusage at all costs. It is appropriate to tolerate a degree of surplusage rather than adopt a textually dubious construction that threatens to render the entire provision a nullity."[37] But the canon's application here wouldn't render any part of the provision a nullity; it would just lead to a result that Thomas dislikes. It's true we don't avoid surplusage at *all* costs—but we do, and we must, avoid it. Here, the surplusage canon counsels against slighting even "a few redundant words" in the statute. Those words are given robust meaning by Mississippi's reading: If "constitutionality of" does not carry over, then "the apportionment" is not rendered superfluous.

D

Thomas does ask us to employ one canon of construction—"that statutes should not be construed in a way that leads to absurd results."[38] Our precedent, however, is not on Thomas's side. As we recently held, "The absurdity bar is high, as it should be. The result must be preposterous, one that 'no reasonable person could intend.'" [39] Justice Scalia and Garner essentially cabin its use to "scrivener's error."[40] As Justice Story put it, the canon's use must be limited to situations "where the absurdity and injustice of applying the provision to the

---

[36] *Lowe v. SEC*, 472 U.S. 181, 207 n.53 (1985).

[37] *See United States v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007).

[38] *See Milavetz, Gallop & Milavetz, P.A. v. United States*, 559 U.S. 229, 245–46 (2010)).

[39] *Tex. Brine Co. L.L.C v. Am. Arbitration Ass'n., Inc.,* No. 18-31184, WL 1682777, at *3 (5th Cir. Apr. 7, 2020) (quoting SCALIA & GARNER, *supra* note 11 § 37, at 237).

[40] SCALIA & GARNER, *supra* note 11 § 37, at 234. A scrivener's error is an inadvertent typo. For example, a court can properly interpret *"third partly"* as *"third party."* *Id.*

No. 19-60133

case would be so monstrous, that all mankind would, without hesitation, unite in rejecting the application."[41]

Thomas's alleged absurdity: "state legislative redistricting cases brought solely under § 2 would be heard by three-judge courts while similar congressional redistricting cases would be heard by single judges." But having a different judicial mechanism for hearing challenges to federal districts than to state districts seems a quintessential policy judgment for Congress. It may be good (or bad) policy, but it's light years away from absurd.[42]

In sum, the absurdity doctrine is inapposite here. The only two relevant canons of construction—the series-qualifier canon and the surplusage canon—work in tandem in favor of the State's "three-judge court" position.

II

The pertinent canons provide guidance enough to arrive at a conclusion: § 2284(a) requires a three-judge district court for any challenges to the apportionment of statewide legislative bodies. One of the arguments against relying on the canons here is that this reading conflicts with § 2284(a)'s statutory history. The motions panel majority reasoned that, when Congress amended § 2284(a) in 1976, Congress could not have "had a special concern

---

[41] *Id.* § 37, at 237 (quoting 1 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 427, at 303 (2d ed. 1858)).

[42] We need not theorize why Congress would treat state legislative and congressional redistricting differently because the absurdity doctrine doesn't require such speculation. But as Judge Clement noted in her motions panel dissent, the answer may lie in federalism: "It is entirely plausible that Congress wanted federal courts to show more deference to state reapportionment plans that only affect state interests than to state reapportionment plans which affect national interest." *Thomas*, 919 F.3d at 323 (Clement, J., dissenting). This reasoning is bolstered by Supreme Court precedent, which, as Judge Clement notes, affords states "greater latitude in creating state legislative districts than in creating congressional districts." *Id.* (citing *Gaffney v. Cummings*, 412 U.S. 735, 742–44 (1973)).

with statutory challenges to the drawing of state legislative districts."[43] That's because, "there was no practice of statutory challenges to state legislative apportionment that Congress needed to address in 1976."[44]

First, our surest guide to what Congress pondered is what Congress passed.[45] But if anything, the statutory history strengthens, rather than weakens, the State's reading of § 2284(a). Almost twenty years ago, the Third Circuit conducted a helpful analysis of the statutory history of § 2284(a) in *Page v. Bartels*.[46] In that case, the only circuit opinion addressing today's issue in any depth, the question was whether a single judge could hear a section 2 claim when a constitutional claim was also asserted. The Third Circuit ruled that when a plaintiff brings both constitutional and statutory challenges, a single district judge can't decide the statutory claim while reserving the constitutional claims for a three-judge court. The *Page* court did "not believe that Congress made a deliberate choice to distinguish between constitutional

---

[43] *Thomas*, 919 F.3d at 307.

[44] *Id.*

[45] We pause to note the important distinction between mining *legislative* history (which is highly disfavored in the Fifth Circuit) and *statutory* history (which isn't). *See, e.g.*, *id.* at 306 (discussing statutory history while discounting legislative history); *see also, BNSF Ry. Co. v. Loos*, 139 S. Ct. 893, 906 (2019) (Gorsuch, J., dissenting) ("[T]he statutory history I have in mind here isn't the sort of unenacted legislative history that often is neither truly legislative (having failed to survive bicameralism and presentment) nor truly historical (consisting of advocacy aimed at winning in future litigation what couldn't be won in past statutes). Instead, I mean here the record of *enacted* changes Congress made to the relevant statutory text over time, the sort of textual evidence everyone agrees can sometimes shed light on meaning."); SCALIA & GARNER, *supra* note 11, at 440 (contrasting statutory history— "[t]he enacted lineage of a statute"—with legislative history); *In re Crocker*, 941 F.3d 206, 213 (5th Cir. 2019) (same); *Mei Xing Yu v. Hasaki Rest., Inc.*, 944 F.3d 395, 418 (2d Cir. 2019) (Calabresi, J., dissenting) (same); *Chhetri v. United States*, 823 F.3d 577, 587 n.13 (11th Cir. 2016) (same).

[46] 248 F.3d 175 (3d Cir. 2001). *The Page* court did not undertake a textual analysis of § 2284(a), likely because neither party advocated such an analysis.

apportionment challenges and apportionment challenges brought under § 2 of the Voting Rights Act."[47] This is because, when the relevant language from the three-judge court statutes was revised in 1976, "§ 2 of the Voting Rights Act was not available to litigants seeking to challenge apportionment."[48] Most challenges were constitutional, and the "established *statutory* basis for such apportionment challenges was § 5 of the Voting Rights Act, whose own statutory provisions required the convening of a three judge-court."[49]

As late as 1980, the Supreme Court "had not even definitely determined whether § 2 of the Voting Rights Act created a private right of action for voters."[50] So when our contested language was drafted almost 45 years ago, Congress would have expected *all* apportionment challenges to go to a three-judge panel, as all cases attacking "the legitimacy of the state legislative apportionment" are "highly sensitive matters."[51] To the extent that voters had a statutory private right of action, they did so under section 5, which, again, provided for a three-judge panel.

The motions panel majority inferred from this statutory history that Congress could not have had a "special concern" with statutory challenges in 1976. But it is Thomas's reading of § 2284(a) that separates statutory and constitutional challenges for disparate treatment when it comes to state maps. We aren't finding a special exception for statutory challenges. Our reading of § 2284(a) puts statutory and constitutional challenges to state maps on equal

---

[47] *Id.* at 189.

[48] *Id.*

[49] *Id.* at 189–90 (citations omitted) (emphasis in original).

[50] *Id.* at 189.

[51] *Id*. at 190.

footing, which affirms what the Third Circuit found twenty years ago: "Congress was concerned less with the *source* of the law on which an apportionment challenge was based than on the unique importance of apportionment challenges generally."[52]

The Third Circuit was correct. The enacted lineage of the Act, how the statutory text changed over time, tracks § 2284(a)'s straight-ahead meaning in light of the relevant interpretive canons. The mechanism of a three-judge district court is meant to be a safety valve in "confrontations between state and federal power or in circumstances involving a potential for substantial interference with government administration."[53] Those federalism concerns are undiminished when a plaintiff opts for a purely statutory challenge to a state reapportionment plan instead of a constitutional one.[54] When it comes to

---

[52] *Id.* (emphasis in original).

[53] *Allen v. State Bd. of Elections*, 393 U.S. 544, 562 (1969); s*ee also Chapman v. Meier*, 420 U.S. 1, 14 (1975) (describing apportionment challenges as "regular grist for the three-judge court"); *Gaffney*, 12 U.S. at 742–44 (noting "fundamental differences" between state and federal line-drawing and that "substantial state considerations" give states greater latitude in drawing state maps than in drawing congressional maps).

[54] In addition to looking at the *statutory* history of § 2284(a), the *Page* court also examined its *legislative* history. So do the parties here. No thanks. Scouring legislative detritus prone to contrivance is more likely to yield confusion than precision. *Zedner v. United States*, 547 U.S. 489, 511 (2006) (Scalia, J., concurring in the judgment) ("[T]he use of legislative history is illegitimate and ill advised in the interpretation of any statute . . . ."). We decline any invitation to supplant (or to supplement) Congress's chosen language, even though a 1975 Senate Judiciary Committee Report supports our conclusion that three judges are required, stating that "[t]hree-judge courts would continue to be required . . . in cases under the Voting Rights Act of 1965, 42 U.S.C. section 1971g, 1973(a), 1973c and 1973h(c)." Report at 9, 1976 U.S.C.C.A.N. at 1996. Section 1973(a) is none other than section 2(a), the statutory basis for Thomas's claim. On the first page of the Committee's Report, entitled "PURPOSE OF BILL," the committee noted that "three-judge courts would be retained . . . in any case involving congressional reapportionment or the reapportionment of any statewide legislative body." Report at 1, 1976 U.S.C.C.A.N. at 1988. The Committee declared that three-judge courts should be preserved for "reapportionment of a statewide legislative body because it is the judgment of the committee that these issues are of such importance that they ought to be heard by a three-judge court." Report at 9, 1976 U.S.C.C.A.N. at 1996. Again, no matter.

state maps affecting (and reflecting) state interests and state considerations, § 2284(a) treats all challenges—statutory and constitutional—equally.

Indeed, had Congress wanted single district judges to decide standalone section 2 challenges to state maps, it certainly had better, simpler ways of saying so. Congress could have made things crystal clear by writing simply (and without surplusage) that a three-judge court is needed to decide only:[55]

- Option 1:    "the constitutionality of the apportionment of congressional districts or [the apportionment] of any statewide legislative body"

- Option 2:    "the constitutionality of the apportionment of congressional districts or [of] the apportionment of any statewide legislative body"

- Option 3:    "the    constitutionality    of    [either]    the apportionment of congressional districts or the apportionment of any statewide legislative body"

But Congress said no such thing. Instead Congress determined to use a determiner. Our task is not to imagine what the 1976 Congress would have wanted. It is to discern meaning in the words the 1976 Congress actually passed. In sum, § 2284(a)'s on-the-books history—again, not the legislative history, but the history of the legislation—reinforces what the canons reveal: A single district judge cannot adjudicate a section 2-only challenge to a state map.

---

The statute itself is what constitutes the law. And since we are a Nation of laws, not of legislative histories, we decline the legal scavenger hunt that turns statutory construction into statutory excavation.

[55] *Thomas*, 919 F.3d at 322–23 (Clement, J., dissenting).

No. 19-60133

III

Another argument against Mississippi's reading of § 2284(a) is the principle that "congressional enactments providing for the convening of three-judge courts must be strictly construed."[56] This is a *substantive* canon of construction, like the rule of lenity (that penal statutes should be given a *narrow* construction) or constitutional avoidance (that statutory language should be given a *saving* construction).[57] But unlike linguistic canons that look for statutory meaning within the words themselves, "substantive canons advance policies independent of those expressed in the statute."[58] Exhibit A is the "strict construction" gloss on three-judge statutes, born 80 years ago out of the Supreme Court's desire to keep its docket small, plus a concern that three-judge jurisdiction "entails a serious drain upon the federal judicial system, particularly in . . . all but the few great metropolitan areas."[59]

But there is a sequence that must be followed. As the Supreme Court has repeatedly made clear, most recently a few months ago, substantive canons of construction are not applied at the outset of textual inquiry.[60] Why? Because a substantive canon (and the social policy it enhances) can never defeat concrete text (and the congressional policy it enshrines). Moreover, even if a statute is deemed ambiguous, *traditional* canons of interpretation must be invoked first. And if those text-centric canons yield an answer, then that's that; the thumb-on-the-scale substantive canons have no role.

---

[56] *Allen*, 393 U.S. at 561.

[57] *See generally,* Barrett, *supra* note 28.

[58] *Id.* at 110.

[59] *Phillips v. United States*, 312 U.S. 246, 250 (1941).

[60] *Shular*, 140 S. Ct. at 787.

No. 19-60133

Take the rule of lenity. Described by then-Professor Barrett as "a rule of thumb for choosing between equally plausible interpretations of ambiguous text,"[61] the rule of lenity has been around for at least half a millennium.[62] It sometimes plays a role, but one more cameo than starring—and only in the final act, if at all. Again, there's a sequence to things. And that's because there's a supremacy to things. Faithful statutory interpreters rightly insist, vehemently so, on legislative supremacy: taking Congress at its word. Thus, there must be ambiguity before there can be lenity.[63] So even if a less-harsh result is grammatically *possible*, courts are duty-bound to seek the truest meaning, not the tenderest one.[64] If a statute has an interpretation that is *most* plausible, as opposed to dueling interpretations that are *equally* plausible, then the lenity canon remains holstered.

As noted above, the Supreme Court made this exact point recently—and unanimously—in *Shular*. Speaking through Justice Ginsburg, the Court refused to apply the rule of lenity, stressing that it "applies only when, after consulting traditional canons of statutory construction, we are left with an ambiguous statute."[65] The *Shular* Court put it simply: "Here, we are left with no ambiguity for the rule of lenity to resolve."[66] Justice Kavanaugh joined *Shular* in full but wrote separately to underscore the primacy of interpretive

---

[61] Barrett, *supra* note 28, at 109.

[62] *Id.* at 128–29.

[63] *Id.* at 131 ("Courts repeatedly emphasized that lenity could never overcome the ordinary meaning of a statute; on the contrary, the principle applied only in the event of ambiguity." (citations omitted)).

[64] *Id.* at 155 ("[T]he best interpretation of a penal statute should always trump a more lenient but less plausible one.").

[65] *Shular*, 140 S. Ct. at 787 (quoting *Shabani*, 513 U.S. at 17).

[66] *Id.*

37

canons over substantive canons, explaining that the rule of lenity plays a role at the *end* of the interpretive process, not at the beginning, and *only* if, after all the traditional tools have been employed, the statute remains not just ambiguous, but "grievously ambiguous."[67]

The same principle applies here. As the motions panel conceded, *Allen*'s strict-construction preference applies only "[t]o the extent there is ambiguity."[68] And if textual canons succeed in revealing § 2284(a)'s most forthright meaning, as they do here, we need not—indeed, *must* not—indulge malleable, atextual canons that beckon us to advance policies unexpressed in the statute itself. Respectfully, we must not forgo § 2284(a)'s most straightforward reading, gleaned from traditional linguistic tools, in favor of a strained reading that stretches Congress's words in order to further exogenous judicial-policy goals. Unambiguous statutes must be left alone, neither expanded (liberally construed) nor contracted (strictly construed).

But even if the traditional, text-focused canons (series-qualifier and surplusage) did not erase ambiguity, *Allen* itself shows that invoking "strict construction" does not guarantee checkmate. A central question in *Allen* was whether section 5 of the Voting Rights Act authorizes three-judge courts only in declaratory-judgment suits brought by States or also in section 5 suits brought by private litigants.[69] The Supreme Court held that, even strictly construing the three-judge language, Congress wanted all section 5 disputes to be heard by three-judge courts.[70] Despite the difficulty of judicial

---

[67] *Id.* at 789 (Kavanaugh, J., concurring).

[68] *Thomas*, 919 F.3d 298 at 308.

[69] *Allen*, 393 U.S. at 561.

[70] *Id.* at 563. Moreover, in his partial concurrence in *Allen*, Justice Harlan noted that, for section 5 cases, "there is no good reason to invoke the normal rule that three-judge court

administration that three-judge courts present, the Court reasoned that "Congress has determined that three-judge courts are desirable in a number of circumstances involving confrontations between state and federal power or in circumstances involving a potential for substantial interference with government administration."[71] Importantly, the Court noted, "The Voting Rights Act of 1965 is an example. Federal supervision over the enforcement of state legislation always poses difficult problems for our federal system."[72]

The Court went on to emphasize that these problems are even more severe when "the enforcement of state enactments may be enjoined and state election procedures suspended because the State has failed to comply with a federal approval procedure."[73] To be sure, section 5 is distinct from section 2, so *Allen* doesn't directly control. But *Allen* is eminently instructive because its holding did not hinge on preclearance. There's certainly not the same degree of confrontation between state and federal governments when suits are brought by individuals. But the *Allen* Court determined that the "potential for disruption of state election procedures remains" when individuals bring suit.[74] And suits by individuals still create the prospect, as here, of a single federal judge overseeing state election procedures. These grave federalism concerns are not erased just because the federal oversight is by a life-tenured Article III judge rather than by an Article I department.[75]

---

statutes should be construed as narrowly as possible." *Id.* at 582 n.1 (Harlan, J., concurring in part and dissenting in part). That's because, generally, those bringing section 5 claims could also bring constitutional claims. *Id.* The same is true here.

[71] *Id.* at 562.

[72] *Id.*

[73] *Id.*

[74] *Id.* at 563.

[75] *See In re Gee*, 941 F.3d 153, 166–67 (5th Cir. 2019) (per curiam) (explaining that

No. 19-60133

Moreover, when *Allen* was decided in 1969, three-judge courts were required to hear *all* claims for injunctive relief against States (and their officials) and *all* constitutional claims seeking to enjoin a federal statute.[76] Appeals from those actions were taken directly to the Supreme Court.[77] This imposed a heavy judicial-administration burden. And it's against that backdrop that the Supreme Court held that three-judge statutes were to be strictly construed. Then, in 1976, Congress significantly narrowed the universe of actions that required three-judge courts.[78] And after Congress stepped in, it seems the Supreme Court has found little need to prophylactically apply the strict-construction gloss.[79]

When *Allen* is considered in light of the old three-judge-court regime under § 2281 and § 2282, the fact that the Supreme Court insisted on three judges for all section 5 challenges is even more telling. Despite the judicial-administration burden imposed by the former three-judge-court statutes, the Court repeated its serious federalism concerns with the potentially disruptive oversight of State election procedures. Those concerns are no less relevant here, especially now that the federal judiciary no longer faces the "serious drain" of three-judge-jurisdiction that concerned the *Phillips* Court 80 years

---

federal oversight of state law by a federal court raises federalism concerns).

[76] *See* 28 U.S.C. § 2281 (state actions); *id.* § 2282 (federal statutes).

[77] *See id.* § 1253.

[78] *See* Pub. L. No. 94–381, 90 Stat 1119, 1119 (1976). Sections 2281 and 2282 were repealed, and § 2284 was amended to require three-judge courts in only two scenarios: (1) "when otherwise required by Act of Congress," and (2) "when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." *Id.*

[79] As best we can tell, the Court hasn't applied *Allen*'s strict-construction admonition—at least for whether a three-judge court should be convened—since Congress acted in 1976.

ago.[80]

## IV

Finally, Thomas invokes custom, stressing that no circuit court has ever interpreted § 2284(a) to require a three-judge court in a section 2-only challenge to a state legislative map. The motions panel likewise emphasized that many years of settled litigation practice "seems enough to prevent [Mississippi] from showing a strong likelihood of succeeding on this issue."[81]

True, none of our sister circuits have ever confronted this question.[82] There's a simple reason for that: No defendant has ever pressed it.[83] In most

---

[80] Judge Costa's opinion avers that our position "jettison[s] Supreme Court precedent." Costa Op. at 15. But we don't suggest that courts should abandon strict construction of three-judge statues. We simply follow the Supreme Court's own strict-construction analysis in *Allen*. The fact that the three-judge regime was so radically curtailed after *Allen* does not mean that strict construction is now irrelevant. But it does make *Allen* more remarkable in hindsight. Even when the Supreme Court had every reason to be concerned with the burdens of convening three-judge courts, it still held that the potential disruption of state election procedures counseled in favor of such courts.

[81] *Thomas*, 919 F.3d at 305.

[82] Thomas also cites *Harris v. Arizona Independent Redistricting Commission,* 136 S. Ct. 1301, 1306 (2016), for the proposition that, in the § 2284(a) context, the Supreme Court has "reviewed [single-judge] decisions without a doubt as to jurisdiction." First, *Harris* was reviewing the decision of a three-judge court, so Thomas's assertion has zero support. Second, *Harris* involved a constitutional challenge, so there was no dispute about whether the three-judge court was proper. Thomas relies on a single parenthetical to a citation in *Harris*: "*See* 28 U.S.C. § 2284(a) (providing for the convention of [a three-judge court] whenever an action is filed challenging the constitutionality of apportionment of legislative districts)." This passing parenthetical citation merely provides the authority for the convening of the three-judge court that heard that case before it arrived at the Supreme Court. Referring to this citation as dicta is an insult to dicta.

[83] While no other circuit courts have confronted this question, two district courts have, both in 2019: *Chestnut v. Merrill*, 356 F. Supp. 3d 1351 (N.D. Ala. 2019) and *Johnson v. Ardoin*, 2019 WL 4318487 (M.D. La. Sept. 12, 2019). Notably, *Chestnut*, which held that § 2284(a) did not require a three-judge court, fails to acknowledge the series-qualifier canon or the superfluous language that results from its reading. *Johnson* reached the same conclusion as *Chestnut* but was bound by the decisions of our motions and merits panels in this case.

reapportionment cases, statutory claims are asserted alongside constitutional claims, rendering moot the 3-judge vs. 1-judge question. But neither litigation practice, however customary, nor "settled understanding,"[84] however inured, can stand against the law's demands.[85]

This is a bedrock principle. Today's case is, after all, a statutory-interpretation dispute, and what matters most are Congress's words, not the until-now-unchallenged assumptions of litigants. The Supreme Court has put it plainly: "a 'long-established practice' does not justify a rule that denies statutory text its fairest reading."[86] Our loyalty runs to Congress and its commands. And as Congress's faithful agents, we must choose fidelity to explicit enactments over the continuity of implicit arrangements. Supreme Court examples abound, such as the Court's 1998 decision rejecting Pennsylvania's argument that Congress would never have imagined that the Americans with Disabilities Act would apply to state prisoners.[87] The Court explained that where statutory meaning is clear (as in today's case once you apply the linguistic canons), it's "irrelevant" whether a specific application was anticipated by Congress.[88] Our duty is to legislative text, not to litigation habits that, until now, have gone merrily along, unexamined.

Just this week, the Supreme Court issued a landmark decision, holding

---

[84] *Thomas*, 938 F.3d at 145.

[85] One reason for the dearth of precedent: section 2 "results cases" are rarely pursued, at least until recently, without accompanying constitutional claims under the Fourteenth or Fifteenth Amendment.

[86] *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015); *see also NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring) ("We did not hesitate to hold the legislative veto unconstitutional even though Congress had enacted, and the President signed, nearly 300 similar provisions over the course of 50 years.").

[87] *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206 (1998).

[88] *Id*. at 212.

that the 56-year-old Civil Rights Act forbids workplace discrimination on the basis of sexual orientation or gender identity.[89] Specifically, the Court declared that "because of sex" encompasses "because of sexual orientation or gender identity." The latter is not distinct from sex discrimination, but a form of it. Hearteningly, all nine Justices applied textual analysis to Title VII, as we do today with § 2284(a), but, just like us, they reached polar-opposite conclusions. In dissent, Justices Alito and Thomas charged the majority with "disregarding over 50 years of uniform judicial interpretation"[90] and protested that "there is not a shred of evidence that any Member of Congress interpreted the statutory text that way when Title VII was enacted."[91] The *Bostock* majority did not—indeed, could not—dispute those facts.[92] It just deemed them immaterial, insisting that what matters (*all* that matters) is the literal text within a statute's four corners—what it called "Title VII's plain terms."[93]

A time traveler from 1964 would doubtless express astonishment that Congress had, unwittingly and unbeknownst to everyone, equated sex discrimination with sexual orientation discrimination (much less with gender identity discrimination)—and that it had done so by adopting a one-word amendment (inserting "sex") from a representative who was cynically trying to

---

[89] *Bostock v. Clayton County*, 2020 WL 3146686, at *3 (U.S. June 15, 2020).

[90] *Id.* at *39 (Alito, J., dissenting). Justices Alito and Thomas derided *Bostock* as pure "legislation"—a "pirate ship" sailing under a false "textualist flag"—an "arrogant" and "radical decision" that constitutes a "brazen abuse of our authority to interpret statutes. *Id.* at *18–19, *21, *39.

[91] *Id.* at *20.

[92] Nor did the Court dispute that the EEOC, the agency charged with enforcing Title VII, went nearly a half-century before it began asserting such coverage. *Id.* at *20.

[93] *Id.* at *8.

scuttle the entire Civil Rights Act.[94] But the *Bostock* majority focused on the "broad language" that Congress adopted, not on the ripple effects, however unforeseen, that flowed from it five decades later.[95] The Court thus gave no interpretive weight to the fact that not a single drafter of Title VII in 1964 intended, noticed, or anticipated that "because of . . . sex" would cover discrimination against homosexual or transgender persons. The Court remarked that resorting to "expected applications" or only those "foreseen at the time of enactment . . . seeks to displace plain meaning of the law in favor of something lying beyond it."[96] Text is paramount—"only the words on the page constitute the law"[97]—and if those words lead to "unexpected consequences," so be it.[98]

Settled practices matter not, nor does the "unanimous consensus" among the courts of appeals stretching across a half-century.[99] As the Court put it: "Judges are not free to overlook plain statutory commands on the strength of nothing more than suppositions about intentions or guesswork about expectations."[100] In the *Bostock* majority's view, language codified by lawmakers is like language coded by programmers. A computer programmer may write faulty code, but the code will perform precisely as written, regardless of what the programmer anticipated. Courts, no less than

---

[94] *Id.* at *16. The term "transgender" actually wasn't coined until the following decade. *Id.* at *34 (Alito, J., dissenting).

[95] *Id.* at *18.

[96] *Id.* at *15.

[97] *Id.* at *4.

[98] *Id.* at *3, *43.

[99] *Id.* at *43 (Alito, J., dissenting).

[100] *Id.* at *18.

computers, are bound by what was typed, and also by what was mistyped. What this means for Title VII: "When a new application emerges that is both unexpected and important," said the Court, it is no answer to "have us merely point out the question, refer the subject back to Congress, and decline to enforce the plain terms of the law in the meantime."[101] We are bound by *Bostock*, whose ascetic interpretive rules for Civil Rights Act cases apply with equal force to Voting Rights Act cases.

Judge Costa's opinion asserts virtually the same arguments as the *Bostock* dissenters, appealing to "venerable" understandings, "widely accepted meaning," and "uniform caselaw."[102] He labels the State's § 2284(a) argument "unprecedented," invoking Justice Scalia's colorful elephants-hiding-in-mouseholes aphorism.[103] This image, born of nondelegation concerns but now taking hold beyond its administrative law origins, is indeed vivid, like Justice Scalia's other renowned animalistic turns of phrase: "this wolf comes as a wolf,"[104] or "jackals stealing the lion's kill" (the latter about Article III judges).[105] But pachyderms and rodents are in the eye of the beholder, leading the Court to apply the maxim "seemingly haphazardly."[106] What some Justices see as "big game," others see as "just a regular rodent."[107] Reasonable judicial

---

[101] *Id.* at *15.

[102] Costa Op. at 1, 17.

[103] *Id.* at 1.

[104] *Morrison v. Olson*, 487 U.S. 654, 699 (1988) (Scalia, J., dissenting).

[105] *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 526 (1988).

[106] Jacob Loshin & Aaron Nielson, *Hiding Nondelegation in Mouseholes*, 62 ADMIN. L. REV. 19, 45 (2010).

[107] *Id.* at 46.

minds can, and do, differ.[108] Perhaps what lurks in the mousehole is, actually, "a rather plump mouse."[109] Or perhaps what some take for a mousehole is, actually, "a rather cramped circus tent."[110] The "elephants in mouseholes" doctrine, while pithy, is beset with unpredictability: "[T]hose in the majority one day are in the dissent the next, and vice versa."[111] But there is a graver problem than inconsistent, "I know it when I see it" application. The elephants-hiding-in-mouseholes canon/doctrine/principle supplants textualism with purposivism, summoning a statute's overarching purpose to inform what the law's actual words mean (to the extent a singular legislative purpose can be divined given the innumerable, untidy trade-offs baked into bill language). Our textualist precedent, one that prizes "bright lines and sharp corners,"[112] is in tension with this purposivist premise. The truest indication of what Congress intended is what Congress enacted.[113] Thus, the biggest danger of mouseholes is a methodological one—that the specter of them will be invoked to justify elephantine departures from statutory text.

In any event, there is another elephant, this one in the room, and it is not hiding. The voting-rights litigation landscape was transformed by the Supreme Court's 2013 decision in *Shelby County*. Any newness to the State's § 2284(a) argument reflects the newness of post-*Shelby County* litigation strategy. *Shelby County* upended the legal playing field, and voting-rights lawyers (on both sides of the docket) are nothing if not adaptive. Once the

---

[108] *Id.* at 46–48 (chronicling the oscillation across cases).

[109] *Id.* at 45.

[110] *Id.*

[111] *Id.*

[112] *Reed*, 923 F.3d at 415.

[113] *Id.*

No. 19-60133

Supreme Court declared section 4's outdated coverage formula facially unconstitutional, thus rendering inoperative section 5's prophylactic preclearance regime (which required three-judge courts), the litigation-based remedies of section 2 instantly took on outsized importance.

Immediately, scholars exhorted courts to give section 2 "special bite," such that "section 2 can be made to function like erstwhile section 5 in the post-*Shelby County* world."[114] The goal: "that the courts, in partnership with the Department of Justice, could reform section 2 so that it fills much of the gap left by the Supreme Court's evisceration of section 5."[115] All to say, any novelty to Mississippi's three-judge argument tracks the relative novelty of a section 2-only challenge, "as Voting Rights Act claims and constitutional claims are usually asserted together,"[116] thus requiring a three-judge court.[117]

Today's question, fundamentally, is about jurisdiction—the very power of federal courts. And "past practice does not, by itself, create power."[118] The power of Article III courts to hear cases is derived from statutes that Congress enacts. And we must give those statutes their fairest reading, regardless of how litigants have (or have not) tried their cases up to now, and regardless of what may be more socially desirable as a policy matter. Judicial duty requires us to revere, not revise, what Congress has passed.

---

[114] Christopher S. Elmendorf & Douglas M. Spencer, *Administering Section 2 of the Voting Rights Act After Shelby County*, 115 COLUM. L. REV. 2143, 2147 (2015).

[115] *Id.* at 2143.

[116] *Thomas*, 919 F.3d at 324 (Clement, J., dissenting).

[117] Costa Op. at 3 n.2 ("Of course, when a plaintiff brings both constitutional and statutory challenges, the constitutional hook for three-judge courts sweeps in the statutory claim.") (citing *Page*, 248 F.3d at 191).

[118] *Medellin v. Texas*, 552 U.S. 491, 532 (2008) (brackets omitted) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)).

No. 19-60133

V

*Verbis legis tenaciter inhaerendum.*

"Hold tight to the words of the law." This medieval legal maxim, fittingly the lead epigraph to *Reading Law*,[119] captures the paramount task of judges when interpreting legal texts: giving enacted language its soundest, most honest meaning. In this case, the language of § 2284(a), read in the light of multiple blackletter interpretive canons, is both the start and the end of our inquiry.

Requiring only a single judge to decide section 2-only challenges may be wise policy, but it is not Congress's enacted policy. While it is *a* plausible reading of the statute, it is not the *most* plausible. The most sure-fire reading of § 2284(a) is that a three-judge court must decide *all* challenges to the apportionment of statewide legislative bodies. The syntax may be fuzzy, but its sense is not. Twin esteemed canons of interpretation, plus § 2284's enacted history, point strongly in the State's favor.

We have endeavored to give § 2284(a) its most forthright meaning, discerning rather than distorting. And scrupulous fidelity to text, giving Congress's words not merely a bearable interpretation but the best one, the most textually plausible one, leads us to conclude that the district court lacked jurisdiction and that its judgment must be vacated.

---

[119] SCALIA & GARNER, *supra* note 11, at v.

No. 19-60133

ANDREW S. OLDHAM, Circuit Judge, concurring:

It appears that the only thing left in this case is Plaintiffs' application for attorney's fees. "Of course, a claim for attorney's fees is not alone sufficient to preserve a live controversy." *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1538 (2020) (Alito, J., dissenting) (citing *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990)). So I agree that the case is moot. I write separately to explain why our *Munsingwear* vacatur also moots Plaintiffs' fee application.

I.

The effect of a *Munsingwear* vacatur is fairly well-known: It "eliminates [the] judgment" below. *United States v. Munsingwear, Inc.*, 340 U.S. 36, 40 (1950). What's less appreciated is *why*.

Think of federal litigation like baseball. In baseball, a team wins nothing by scoring the most runs in the first inning. Rather, we declare the winner after nine. *See* Major League Baseball, Official Baseball Rules, R. 7.01(a) (2018). Sometimes, uncontrollable circumstances—bad weather or a legal curfew, for example—bring play to a halt and require calling the game early. *Id.* R. 7.02(a). If, at the time the game is called, "five innings have [not] been completed," *id.* R.7.01(c), the umpire declares "No Game," *id.* R. 7.01(e). Neither team wins. *Id.* R. 1.06. As far as the League is concerned, it's as if the game never happened at all.

Litigation is functionally identical. When a party secures a contested judgment in the district court, it has a lead. But it hasn't won anything yet. It must first protect its lead—the judgment—in the court of appeals. If certiorari is granted, the party must protect it again before the Supreme Court. But if, "through happenstance," the case becomes moot before the Supreme Court can review it, *Munsingwear*, 340 U.S. at 40, the umpire declares "No Game." Inferior-court decisions, like the first innings of baseball games, are "only

49

preliminary." *Ibid.* So they must be vacated and "prevent[ed] . . . from spawning any legal consequences." *Id.* at 41.

Of course, not all cases make their way to the Supreme Court. But many do reach ours. And we too have a "duty . . . to set aside the decree below" when "the controversy has become entirely moot" before we can issue a decision. *Great W. Sugar Co. v. Nelson*, 442 U.S. 92, 93 (1979) (per curiam) (quotation omitted). Again, a first-inning lead is no victory.

And with no victory, a plaintiff cannot demand "prevailing party" fees. For example, the Supreme Court has told us that, when a plaintiff wins a preliminary injunction but ends up losing the case on the merits, the plaintiff doesn't get prevailing-party fees. *See Sole v. Wyner*, 551 U.S. 74, 78 (2007). Why? Because, "at the end of the litigation, her initial success is undone and she leaves the courthouse emptyhanded." *Ibid.*

## II.

Plaintiffs in this case secured a first-inning lead: judgment in the district court. But, through no fault of either party, the game was called early without review by our court. So, despite Plaintiffs' preliminary success, today's *Munsingwear* vacatur means they leave the courthouse emptyhanded. We've "strip[ped] the decision below of its binding effect." *Deakins v. Monaghan*, 484 U.S. 193, 200 (1988).

This spells an end to Plaintiffs' fee application. Plaintiffs told the district court they would ask for "prevailing party" fees. *See* Unopposed Motion for Extension of Time to Apply for Attorneys' Fees & Costs, *Thomas v. Bryant*, No. 18-cv-441, Doc. 94 (S.D. Miss. Mar. 12, 2019).[1] But a plaintiff cannot demand prevailing party fees without, well, having *prevailed*.

---

[1] It's not entirely clear what statute plaintiffs think could provide them "prevailing party" fees. They told the district court that it was 42 U.S.C. § 1988. That's wrong. That statute provides "prevailing party" fees in actions under 42 U.S.C. §§ 1981, 1981a, 1982, 1983,

Plaintiffs in this case "prevailed" no more than the plaintiff in *Sole*. Plaintiffs in both cases enjoyed the benefit of the district courts' decisions for a time. But, just as a loss at the end of a case terminates the benefit of temporary injunctive relief, *see Sole*, 551 U.S. at 84–86, so too does a vacatur take away whatever benefits were held by the winning party in the district court. Plaintiffs in both cases had only a "transient victory." *Id.* at 78. Plaintiffs in both cases had that "transient victory" stripped of its legal effect. And plaintiffs in neither case can demand prevailing party fees. *See N.Y. State Rifle & Pistol Ass'n*, 140 S. Ct. at 1538 (Alito, J., dissenting) (noting that a successful [civil-rights] plaintiff "is eligible for attorney's fees," but "dismissing the case as moot means [plaintiffs] are stuck with the attorney's fees they incurred"); *S-1 v. State Bd. Of Educ. of N.C.*, 21 F.3d 49, 51 (4th Cir. 1994) (en banc) (per curiam) ("[T]he dismissal on appeal of an action . . . as moot operates to vacate the judgment below, and prevents the plaintiffs from being found prevailing parties by virtue of post-dismissal events." (quotation omitted)).

Before the Supreme Court's decision in *Sole*, we misunderstood the rules of the game. We said, for example, "that a determination of mootness neither precludes nor is precluded by an award of attorneys' fees. The attorneys' fees question turns instead on a wholly independent consideration: whether plaintiff is a 'prevailing party.'" *Murphy v. Fort Worth Indep. Sch. Dist.*, 334 F.3d 470, 471 (5th Cir. 2003) (per curiam) (quotation omitted). Obviously, the

---

1985, & 1986, Title IX, RFRA, RLUIPA, Title VI of the Civil Rights Act of 1964, and 34 U.S.C. § 12361. *See* 42 U.S.C. § 1988(b). Plaintiffs sued under none of these statutes. They sued instead under Section 2 of the Voting Rights Act. *See* Compl. ¶ 37; Am. Compl. ¶ 37. The Voting Rights Act has its own prevailing-party fee provision. *See* 52 U.S.C. § 10310(e). But it applies only in an "action or proceeding to enforce the voting guarantees of the fourteenth or fifteenth amendment . . . ." *Ibid.* Since plaintiffs forswore any relief under the Constitution—which is the whole reason this case was not referred to a three-judge panel—they cannot recover fees under § 10310(e) either. As noted in the body text, however, none of this matters because plaintiffs are not "prevailing parties."

Supreme Court has now told us that's wrong: Plaintiffs' prevailing-party status is wholly *dependent* on whether they walk out the courthouse doors with an enforceable judgment. *See Sole*, 551 U.S. at 78; *Farrar v. Hobby*, 506 U.S. 103, 113 (1992) ("No material alteration of the legal relationship between the parties occurs until the plaintiff becomes entitled to enforce a judgment, consent decree, or settlement against the defendant."); *cf. Staley v. Harris Cty.*, 485 F.3d 305, 314 (5th Cir. 2007) (en banc) (holding plaintiff can be a prevailing party where we *refuse* to order *Munsingwear* vacatur and plaintiff kept its judgment). Our *Munsingwear* vacatur deprives Plaintiffs of such a judgment. With that understanding, I concur.