# SUPREME COURT OF THE UNITED STATES

NORTH CAROLINA, ET AL., APPELLANTS *v.*
SANDRA LITTLE COVINGTON, ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF NORTH CAROLINA

No. 17–1364.   Decided June 28, 2018

PER CURIAM.

This appeal arises from a remedial redistricting order entered by the District Court in a racial gerrymandering case we have seen before. The case concerns the redistricting of state legislative districts by the North Carolina General Assembly in 2011, in response to the 2010 census. A group of plaintiff voters, appellees here, alleged that the General Assembly racially gerrymandered their districts when—in an ostensible effort to comply with the requirements of the Voting Rights Act of 1965—it drew 28 State Senate and State House of Representatives districts comprising majorities of black voters. The District Court granted judgment to the plaintiffs, and we summarily affirmed that judgment. See *Covington* v. *North Carolina*, 316 F. R. D. 117 (MDNC 2016), summarily aff'd, 581 U. S. \_\_\_ (2017).

At the same time, however, we vacated the District Court's remedial order, which directed the General Assembly to adopt new districting maps, shortened by one year the terms of the legislators currently serving in the gerrymandered districts, called for special elections in those districts, and suspended two provisions of the North Carolina Constitution. See *North Carolina* v. *Covington*, 581 U. S. \_\_\_, \_\_\_ (2017) (*per curiam*) (slip op., at 1–2). The District Court ordered all of this, we noted, after undertaking only the "most cursory" review of the equitable balance involved in court-ordered special elections. *Id.,* at \_\_\_ (slip op., at 3). Having found that the District

Court's discretion "'was barely exercised,'" we remanded the case for further remedial proceedings. *Ibid.* (quoting *Winter* v. *Natural Resources Defense Council, Inc.*, 555 U. S. 7, 27 (2008)).

On remand, the District Court ordered the General Assembly to draw remedial maps for the State House and State Senate within a month, and to file those maps in the District Court for approval. The General Assembly complied after directing its map drawers to, among other things, make "[r]easonable efforts . . . to avoid pairing incumbent members of the House [and] Senate" and not to use "[d]ata identifying the race of individuals or voters" in the drawing of the new districts. 283 F. Supp. 3d 410, 417–418 (MDNC 2018) (*per curiam*). The plaintiffs filed objections to the new maps. They argued that four legislative districts—Senate Districts 21 and 28 and House Districts 21 and 57—still segregated voters on the basis of race. The plaintiffs also objected to the General Assembly's decision to redraw five State House districts situated in Wake and Mecklenburg Counties. They argued that those five districts "did not violate the [U. S.] Constitution, [and] did not abut a district violating the [U. S.] Constitution." *Id.,* at 443. Thus, they contended, the revision of the borders of those districts constituted mid-decade redistricting in violation of the North Carolina Constitution. See Art. II, §5(4); *Granville County Commr's* v. *Ballard*, 69 N. C. 18, 20–21 (1873).

After some consideration of these objections, the District Court appointed a Special Master to redraw the lines of the districts to which the plaintiffs objected, along with any nonadjacent districts to the extent "necessary" to comply with districting criteria specified by the District Court. App. to Juris. Statement 106–107. Those criteria included adherence to the "county groupings" used by the legislature in its remedial plan and to North Carolina's "Whole County Provision as interpreted by the North

Carolina Supreme Court." *Id.,* at 108. The District Court further instructed the Special Master to make "reasonable efforts to adhere to . . . state policy objectives" by creating relatively compact districts and by avoiding split municipalities and precincts. *Id.,* at 108–109. The District Court also permitted the Special Master to "adjust district lines to avoid pairing any incumbents who have not publicly announced their intention not to run in 2018" and to "consider data identifying the race of individuals or voters to the extent necessary to ensure that his plan cures the unconstitutional racial gerrymanders." *Id.,* at 109–111.

Upon receipt of the Special Master's report, the District Court sustained the plaintiffs' objections and adopted the Special Master's recommended reconfiguration of the state legislative maps. See 283 F. Supp. 3d, at 414. With respect to Senate Districts 21 and 28 and House Districts 21 and 57, the District Court found that those districts, as redrawn by the legislature, "retain[ed] the core shape" of districts that it had earlier found to be unconstitutional. *Id.,* at 436; see *id.,* at 439, 440, 441–442. The District Court noted, for instance, that the legislature's remedial plan for Senate District 21 copied the prior plan's "horseshoe-shaped section of the city of Fayetteville," which "include[d] Fayetteville's predominantly black [voting districts] and blocks and exclude[d] Fayetteville's predominantly white [voting districts] and blocks." *Id.,* at 436. Although the defendants explained that the new district was designed to "'preserve the heart of Fayetteville,'" the District Court found that they had "fail[ed] to provide any explanation or evidence as to why 'preserving the heart of Fayetteville' required the exclusion of numerous majority-white precincts in downtown Fayetteville from the remedial district." *Ibid.* (alterations omitted). Likewise, the District Court found that the legislature's remedial version of Senate District 28, though it "encompasse[d] only a portion of [the city of] Greensboro," never-

theless "encompasse[d] *all* of the majority black [voting districts] within Greensboro," while "exclud[ing] predominantly white sections of Greensboro," and "reach[ing] out of Greensboro's city limits to capture predominantly African-American areas in eastern Guilford County." *Id.,* at 438. By choosing to preserve the shape of the district's "'anchor'" in eastern Greensboro, the District Court found, the General Assembly had "ensured that the district would retain a high [black voting age population], thereby perpetuating the effects of the racial gerrymander." *Id.,* at 438–439.

The District Court made similar findings with respect to the legislature's remedial House Districts 21 and 57. House District 21, it found, "(1) preserve[d] the core shape of . . . the previously unconstitutional district, (2) include[d] all but one of the majority-black [voting districts] in the two counties through which it [ran], (3) divide[d] a municipality and precinct along racial lines, [and] (4) ha[d] an irregular shape that corresponde[d] to the racial make-up of the geographic area." *Id.,* at 439–440. In light of this and other evidence, the District Court concluded that House District 21 "continue[d] to be a racial gerrymander." *Id.,* at 440. House District 57, the District Court found, likewise inexplicably "divide[d] the city of Greensboro along racial lines," *id.,* at 442, and otherwise preserved features of the previously invalidated 2011 maps. The District Court thus concluded that the General Assembly's remedial plans as to those districts were unconstitutional. *Ibid.*

The District Court then sustained the plaintiffs' remaining objection that several House districts in Wake and Mecklenburg Counties had been redrawn unnecessarily in violation of the North Carolina Constitution's prohibition on mid-decade redistricting. See *id.,* at 443 (citing Art. II, §5(4)). The court reasoned that the prohibition "preclude[d] the General Assembly from engaging in mid-

decade redistricting" except to the extent "required by federal law or a judicial order." 283 F. Supp. 3d, at 443. It noted further that, "[w]hen a court must draw remedial districts itself, this means that a court may redraw only those districts necessary to remedy the constitutional violation," *ibid.* (citing *Upham* v. *Seamon*, 456 U. S. 37, 40–41 (1982) (*per curiam*)), and that "*Upham* requires that a federal district court's remedial order not unnecessarily interfere with state redistricting choices," 283 F. Supp. 3d, at 443. This remedial principle informed the District Court's conclusion that "the General Assembly [had] exceeded its authority under [the District Court's remedial] order by disregarding the mid-decade redistricting prohibition," since the legislature had failed to "put forward any evidence showing that revising *any* of the five Wake and Mecklenburg County House districts challenged by Plaintiffs was necessary to remedy the racially gerrymandered districts in those two counties." *Id.,* at 444.

Finally, the District Court adopted the Special Master's recommended replacement plans for the districts to which the plaintiffs had objected. In adopting those recommendations, the District Court turned away the defendants' argument that they were built on "specific . . . quota[s]" of black voters in each reconstituted district. *Id.,* at 448–449. The District Court instead credited the Special Master's submission that his "'remedial districts were drawn not with any racial target in mind, but in order to maximize compactness, preserve precinct boundaries, and respect political subdivision lines,'" and that the remedial map was the product of "'explicitly race-neutral criteria.'" *Id.,* at 449. The District Court directed the defendants to implement the Special Master's recommended district lines and to conduct elections accordingly.

The defendants applied to this Court for a stay of the District Court's order pending appeal. We granted a stay with respect to implementation of the Special Master's

remedial districts in Wake and Mecklenburg Counties, but otherwise denied the application. See 583 U. S. ___ (2018). The defendants timely appealed directly to this Court as provided under 28 U. S. C. §1253. We have jurisdiction, and now summarily affirm in part and reverse in part the order of the District Court.

*          *          *

The defendants first argue that the District Court lacked jurisdiction even to enter a remedial order in this case. In their view, "[w]here, as here, a lawsuit challenges the validity of a statute," the case becomes moot "when the statute is repealed." Juris. Statement 17. Thus, according to the defendants, the plaintiffs' racial gerrymandering claims ceased to exist when the North Carolina General Assembly enacted remedial plans for the State House and State Senate and repealed the old plans.

The defendants misunderstand the nature of the plaintiffs' claims. Those claims, like other racial gerrymandering claims, arise from the plaintiffs' allegations that they have been "separate[d] . . . into different districts on the basis of race." *Shaw* v. *Reno*, 509 U. S. 630, 649 (1993). Resolution of such claims will usually turn upon "circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing" the lines of legislative districts. *Miller* v. *Johnson*, 515 U. S. 900, 913 (1995). But it is the segregation of the plaintiffs—not the legislature's line-drawing as such—that gives rise to their claims. It is for this reason, among others, that the plaintiffs have standing to challenge racial gerrymanders only with respect to those legislative districts in which they reside. See *Alabama Legislative Black Caucus* v. *Alabama*, 575 U. S. ___, ___ (2015) (slip op., at 6). Here, in the remedial posture in which this case is presented, the plaintiffs' claims that they were organized into legislative

districts on the basis of their race did not become moot simply because the General Assembly drew new district lines around them. To the contrary, they argued in the District Court that some of the new districts were mere continuations of the old, gerrymandered districts. Because the plaintiffs asserted that they remained segregated on the basis of race, their claims remained the subject of a live dispute, and the District Court properly retained jurisdiction.

Second, the defendants argue that the District Court erred when it "conclu[ded] that the General Assembly engaged in racial gerrymandering by declining to consider race." Juris. Statement 20. They assert that "there is no dispute that the General Assembly did *not* consider race *at all* when designing the 2017 [remedial plans]—not as a predominant motive, a secondary motive, or otherwise," and that such "undisputed fact should have been the end of the plaintiffs' racial gerrymandering challenges." *Id.,* at 21–22.

This argument suffers from the same conceptual flaws as the first. While it may be undisputed that the 2017 legislature instructed its map drawers not to look at race when crafting a remedial map, what is also undisputed— because the defendants do not attempt to rebut it in their jurisdictional statement or in their brief opposing the plaintiffs' motion to affirm—is the District Court's detailed, district-by-district factfinding respecting the legislature's remedial Senate Districts 21 and 28 and House Districts 21 and 57.

That factfinding, as discussed above, turned up sufficient circumstantial evidence that race was the predominant factor governing the shape of those four districts. See, *e.g.,* 283 F. Supp. 3d, at 436. As this Court has previously explained, a plaintiff can rely upon either "circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose" in prov-

ing a racial gerrymandering claim. *Miller, supra,* at 916. The defendants' insistence that the 2017 legislature did not look at racial data in drawing remedial districts does little to undermine the District Court's conclusion—based on evidence concerning the shape and demographics of those districts—that the districts unconstitutionally sort voters on the basis of race. 283 F. Supp. 3d, at 442.

Third, the defendants argue that the District Court abused its discretion by arranging for the Special Master to draw up an alternative remedial map instead of giving the General Assembly—which "stood ready and willing to promptly carry out its sovereign duty"—another chance at a remedial map. Juris. Statement 33. Yet the District Court had its own duty to cure illegally gerrymandered districts through an orderly process in advance of elections. See *Purcell* v. *Gonzalez,* 549 U. S. 1, 4–5 (2006) (*per curiam*). Here the District Court determined that "providing the General Assembly with a second bite at the apple" risked "further draw[ing] out these proceedings and potentially interfer[ing] with the 2018 election cycle." 283 F. Supp. 3d, at 448, n. 10. We conclude that the District Court's appointment of a Special Master in this case was not an abuse of discretion.

Neither was the District Court's decision to adopt the Special Master's recommended remedy for the racially gerrymandered districts. The defendants argue briefly that the District Court's adoption of that recommendation was error because the Special Master's remedial plan was "expressly race-conscious" and succeeded in "compel[ling] the State to employ racial quotas of plaintiffs' choosing." Juris. Statement 34–35. Yet this Court has long recognized "[t]he distinction between being aware of racial considerations and being motivated by them." *Miller, supra*, at 916. The District Court's allowance that the Special Master could "consider data identifying the race of individuals or voters to the extent necessary to ensure

that his plan cures the unconstitutional racial gerrymanders," App. to Juris. Statement 111, does not amount to a warrant for "racial quotas." In any event, the defendants' assertions on this question make no real attempt to counter the District Court's agreement with the Special Master that "'no racial targets were sought or achieved'" in drawing the remedial districts. 283 F. Supp. 3d, at 449.

All of the foregoing is enough to convince us that the District Court's order should be affirmed insofar as it provided a court-drawn remedy for Senate Districts 21 and 28 and House Districts 21 and 57. The same cannot be said, however, of the District Court's actions concerning the legislature's redrawing of House districts in Wake and Mecklenburg Counties. There the District Court proceeded from a mistaken view of its adjudicative role and its relationship to the North Carolina General Assembly.

The only injuries the plaintiffs established in this case were that they had been placed in their legislative districts on the basis of race. The District Court's remedial authority was accordingly limited to ensuring that the plaintiffs were relieved of the burden of voting in racially gerrymandered legislative districts. See *DaimlerChrysler Corp.* v. *Cuno*, 547 U. S. 332, 353 (2006). But the District Court's revision of the House districts in Wake and Mecklenburg Counties had nothing to do with that. Instead, the District Court redrew those districts because it found that the legislature's revision of them violated the North Carolina Constitution's ban on mid-decade redistricting, not federal law. Indeed, the District Court understood that ban to apply unless such redistricting was "required by federal law or judicial order." 283 F. Supp. 3d, at 443. The District Court's enforcement of the ban was thus premised on the conclusion that the General Assembly's action was not "required" by federal law.

The District Court's decision to override the legislature's remedial map on that basis was clear error. "[S]tate legis-

latures have primary jurisdiction over legislative reapportionment," *White* v. *Weiser*, 412 U. S. 783, 795 (1973) (internal quotation marks omitted), and a legislature's "freedom of choice to devise substitutes for an apportionment plan found unconstitutional, either as a whole or in part, should not be restricted beyond the clear commands" of federal law, *Burns* v. *Richardson*, 384 U. S. 73, 85 (1966). A district court is "not free . . . to disregard the political program of" a state legislature on other bases. *Upham*, 456 U. S., at 43. Once the District Court had ensured that the racial gerrymanders at issue in this case were remedied, its proper role in North Carolina's legislative districting process was at an end.

The order of the District Court is affirmed in part and reversed in part.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

### NORTH CAROLINA, ET AL. *v.* SANDRA LITTLE COVINGTON, ET AL.

#### ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

No. 17–1364.   Decided June 28, 2018

JUSTICE THOMAS, dissenting.

I do not think the complicated factual and legal issues in this case should be disposed of summarily.  I would have set this case for briefing and oral argument.  I respectfully dissent.