# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SUSAN SOTO PALMER; ALBERTO
MACIAS; FABIOLA LOPEZ; CATY
PADILLA; HELIDORA MORFIN,

     *Plaintiffs - Appellees*,

  v.

STEVEN HOBBS, in his official
capacity as Secretary of State of
Washington; STATE OF
WASHINGTON,

     *Defendants - Appellees*,

JOSE A. TREVINO; ISMAEL G.
CAMPOS; ALEX YBARRA,

     *Intervenor-Defendants -
Appellants*.

Nos.  23-35595
24-1602

D.C. No.
3:22-cv-05035-
RSL

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert S. Lasnik, District Judge, Presiding

Argued and Submitted March 27, 2025
Seattle, Washington

Filed August 27, 2025

Before: M. Margaret McKeown, Ronald M. Gould, and
John B. Owens, Circuit Judges.

Opinion by Judge McKeown

## SUMMARY[*]

### Voting Rights

In appeals brought by three Yakima voters who intervened before the district court to challenge the district court's decisions (1) enjoining the Washington State redistricting commission's legislative district map for the state's Yakima Valley Region (Enacted Map) and (2) imposing a new legislative map in its place (Remedial Map), the panel affirmed in part the district court's remedial order and judgment and dismissed in part the appeals for lack of jurisdiction.

Plaintiffs sued the State of Washington and its Secretary of State, arguing that the commission's Enacted Map violated Section 2 of the Voting Rights Act. Their lawsuit was successful, such that the district court enjoined the Enacted Map. After the redistricting commission declined to craft a new map, the court did so itself by fashioning the Remedial Map. None of the original parties sought to disturb the district court's decision. Instead, Intervenors

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

appealed, challenging the district court's Section 2 liability determination pertaining to the Enacted Map, and also alleging that the Remedial Map violated the Equal Protection Clause of the Fourteenth Amendment and Section 2.

The panel first held that the district court properly exercised jurisdiction over the Voting Rights Act challenge to the Remedial Map. The panel rejected the Intervenors' assertion that 28 U.S.C. § 2284 requires a three-judge district court for a statutory challenge to redistricting, holding that Section 2284's plain language, the relevant interpretive canon, and the statutory history confirm that in the absence of congressional guidance, a three-judge district court needs to be convened only for constitutional challenges, not statutory challenges, to legislative apportionment.

Addressing standing, the panel first held that Intervenors lacked standing to appeal the district court's liability finding pertaining to the Enacted Map because they failed to show that their alleged gerrymandering injuries were traceable or redressable; Interventors failed to provide evidence that the district court classified them on the basis of race and also failed to allege a real and immediate threat of repeated injury. Next, Intervenors lacked standing to appeal the Remedial Map as violating Section 2 because they failed to adequately allege vote dilution. One intervenor, however, had standing to bring an equal protection challenge against the Remedial Map because his asserted racial-classification injury of being moved between legislative districts was a cognizable harm in the context of a racial gerrymandering claim, and the vacatur of the Remedial Map could redress his ongoing representation harm.

Exercising its discretion to address the merits despite Interventors' likely forfeiture, the panel held that the district

court's Remedial Map did not discriminate on the basis of race in violation of the Equal Protection Clause. Intervenors failed to demonstrate that race was the predominant factor motivating the district court's decisions. Rather, the district court's thoughtful attention to the details of the maps, population and voter numbers, and viable alternatives confirmed that race was not the predominant factor in shaping the map.

The panel dismissed the appeal of the liability order pertaining to the Enacted Map for lack of jurisdiction. The panel further dismissed the appeal of the remedial order and judgment pertaining to the Remedial Map for lack of jurisdiction, except for the district court's dismissal of Intervenors' equal protection claims, which the panel affirmed.

**COUNSEL**

Annabelle E. Harless (argued), Campaign Legal Center, Chicago, Illinois; Mark P. Gaber, Simone T. Leeper, Aseem Mulji, and Benjamin Phillips, Campaign Legal Center, Washington, D.C.; Ernest I. Herrera and Thomas A. Saenz, Mexican American Legal Defense and Educational Fund, Los Angeles, California; Chad W. Dunn and Sonni Waknin, UCLA Voting Rights Project, Los Angeles, California; Edwardo Morfin, Morfin Law Firm PPLC, Tacoma, Washington; for Plaintiffs-Appellees.

Andrew R.W. Hughes (argued), Assistant Attorney General; Cristina Sepe, Deputy Solicitor General; Office of the Washington Attorney General, Seattle, Washington; Kate S. Worthington Assistant Attorney General; Karl D. Smith,

Deputy Solicitor General; Robert W. Ferguson, Attorney General; Office of the Washington Attorney General, Olympia, Washington; for Defendants-Appellees.

Dallin B. Holt (argued) and Drew C. Ensign, Holtzman Vogel Baran Torchinsky & Josefiak PLLC, Phoenix, Arizona; Phillip M. Gordon and Caleb Acker, Holtzman Vogel Baran Torchinsky & Josefiak PLLC, Haymarket, Virginia; Jason B. Torchinsky, Holtzman Vogel Baran Torchinsky & Josefiak PLLC, Washington, D.C.; Andrew R. Stokesbary, Chalmers Adams Backer & Kaufman LLC, Seattle, Washington; for Intervenor-Defendants-Appellants.

Sam Spiegelman and Jackson Maynard, Citizen Action Defense Fund, Olympia, Washington, for Amicus Curiae Citizen Action Defense Fund.

Paul Graves, Auburn, Washington, for Amici Curiae Sarah Augustine, Joe Fain, and Paul Graves.

Ruth M. Greenwood and Samuel Davis, Election Law Clinic, Harvard Law School, Cambridge, Massachusetts, for Amicus Curiae Latino Community Fund of Washington State.

**OPINION**

McKEOWN, Circuit Judge:

In the last four years, there have been two consecutive attempts to ensure that all voters in Washington State's Yakima Valley could cast votes of equal weight. The state's redistricting commission tried first in 2021, as part of the statewide reapportionment process that occurs every ten years. This appeal centers on the second effort: After enjoining the part of the commission's map corresponding to the Yakima Valley region, a federal district court imposed a new map in place of the original. On appeal, we address certain challenges to the district court's remedial map.

The case comes to our court in an unusual posture. Susan Soto Palmer and a group of Latino voters in the Yakima Valley sued the State of Washington and its Secretary of State, Steven Hobbs, arguing that the commission's map violated Section 2 of the Voting Rights Act. Their lawsuit was successful, such that the district court enjoined the enacted map. After the redistricting commission declined to craft a new map, the court did so itself. The State chose to accept the new map rather than appeal. Consequently, none of the original parties sought to disturb the district court's decision.

Instead, three Yakima Valley voters, after permissively intervening before the district court, now challenge both the liability determination and the new remedial map. They argue that the liability determination against the commission's enacted map, as well as the remedial map, violated the Equal Protection Clause of the Fourteenth Amendment and Section 2 of the Voting Rights Act. They also challenge the district court's jurisdiction.

After determining that the district court had jurisdiction, we conclude that the Intervenors lack standing to challenge the district court's liability determination. They also lack standing to challenge the remedial map under Section 2. However, at least one Intervenor has standing to challenge the remedial map under the Fourteenth Amendment. Despite Intervenors' likely forfeiture of the equal protection argument, we exercise our discretion to consider the issue. In sum, the district court's remedial map did not discriminate on the basis of race in violation of the Equal Protection Clause, and we affirm the district court.

## Background

As required by the Constitution, the U.S. Census is conducted every ten years. The updated numbers of residents are used to ensure that each federal and state district within the states have approximately the same number of people, in accordance with constitutional equal-population requirements. Thus, the Census regularly catalyzes redistricting efforts, and the latest Census—conducted in 2020—was no different.

Washington State requires that its federal and state legislative districts be drawn by a five-member, bipartisan, independent redistricting commission ("Commission"). After the 2020 Census, new members were appointed to the Commission according to the procedures laid out in the state constitution: The majority and minority leaders in both legislative houses each appointed one of the four voting Commissioners, and the four voting Commissioners then voted to appoint the nonvoting chair. The Commission was tasked with agreeing by majority vote on a new legislative map for the state by November 15, 2021.

The 2020 Census data for Washington State showed significant population growth in the Yakima Valley, a region in central Washington known for its agriculture, particularly fruit production. During the Commission's map negotiations, a debate arose among the Commissioners over whether and how the districts in the Yakima Valley needed to be altered to comply with the Voting Rights Act. At the center of this debate was the area including and to the east of the Yakama Nation Reservation, which would become Legislative District 15 ("LD 15").

On November 16, 2021, the Commission unanimously approved a new legislative district map ("the Enacted Map"). The Legislature adopted the map, with minor adjustments, in February 2022.

Susan Soto Palmer and other voters in Washington State's Yakima Valley ("collectively Soto Pamer") filed suit against Washington State and its Secretary of State ("the State"), alleging that the Enacted Map, especially the configuration of LD 15, diluted their votes and deprived them of an equal opportunity to elect the candidates of their choice, in violation of Section 2 of the Voting Rights Act.

Jose Trevino, Alex Ybarra, and Ismael Campos ("Intervenors") were granted permissive intervention by the district court. Trevino is a Latino voter who was re-sorted from LD 15 under the Enacted Map to the new LD 14 under the district court's remedial map. Ybarra is a Washington state legislator representing LD 13 and also a voter in that district. Campos is a registered Latino voter in LD 8.

After conducting a four-day bench trial, the district court determined that Latinos in the Yakima Valley formed a geographically compact community of interest. According to the district court, the boundaries of LD 15 illegally

"cracked"[1] that community, thereby depriving them of an equal opportunity to elect candidates of their choice in violation of Section 2.

The district court then requested that the Commission draw a remedial district. When the Commission "declined," the court drew its own map, relying in part on briefs and remedial proposals from Soto Palmer. Intervenors and the State elected not to submit any proposed maps by the court's deadline. Later, Intervenors offered a map that failed to remedy the Section 2 violation. The court considered this proffered map despite its untimeliness. Intervenors offered feedback on the proposed maps, which Soto Palmer revised in response. Upon learning that Soto Palmer's Map 3A was the court's likely preferred alternative, Intervenors requested an evidentiary hearing. Following a hearing, the court imposed an adjusted version of Map 3A, known as Plaintiffs' Map 3B (the "Remedial Map"). Intervenors timely appealed, seeking to vacate the Remedial Map. That appeal was consolidated with Intervenors' earlier timely appeal on liability. We have jurisdiction under 28 U.S.C. § 1291.

## Analysis

### I.  District Court's Jurisdiction

We begin with Intervenors' challenge to the district court's jurisdiction. Although Intervenors conceded below that a single-judge court could hear Soto Palmer's statutory claims, Intervenors now argue that the single-judge district court lacked jurisdiction. They claim that 28 U.S.C. § 2284 requires a three-judge panel for statutory as well as

---

[1] "Cracking means dividing a party's supporters among multiple districts so that they fall short of a majority in each one." *Gill v. Whitford*, 585 U.S. 48, 55 (2018) (quoting allegations in the complaint).

constitutional challenges to state legislative districts. Section 2284(a) provides: "A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." Intervenors read the phrase "the constitutionality of" to modify only "the apportionment of congressional districts," and not "the apportionment of any statewide legislative body." Thus, in their view, Section 2284 requires that statutory as well as constitutional challenges to the apportionment of state legislative districts be heard by three judges, not one.

We do not share Intervenors' strained interpretation of Section 2284's plain language. The most natural reading is that a three-judge district court must be convened to hear a statutory challenge when such a court is "required by Act of Congress." And, in the absence of such congressional guidance, a three-judge district court must be convened only for a constitutional challenge to legislative apportionment, whether state or federal.

Although the text is unambiguous, the relevant interpretive canon corroborates our reading of the statute. The series-qualifier canon instructs that "[w]hen several words are followed by a clause which is applicable as much to the first and other words as to the last, the natural construction of the language demands that the clause be read as applicable to all." *Porto Rico Ry., Light & Power Co. v. Mor*, 253 U.S. 345, 348 (1920). Under this principle, "the constitutionality of" should be read to apply to "the apportionment of any statewide legislative body" as well as to "the apportionment of congressional districts." *See*

*Thomas v. Reeves*, 961 F.3d 800, 803 (5th Cir. 2020) (en banc) (Costa, J., concurring).

The statutory history further buttresses our interpretation of the text. Historically, general provisions for three-judge district courts concerned only constitutional questions. *See* Act of March 3, 1911, ch. 321, 36 Stat. 1162 (requiring that any interlocutory injunction against a state statute issued "upon the ground of the unconstitutionality of such statute" be "heard and determined by three judges"); Act of February 13, 1925, ch. 229, 43 Stat. 938 (extending the three-judge requirement to "the final hearing in such suit in the district court"); Act of August 24, 1937, ch. 754, 50 Stat. 752 (creating a three-judge procedure for "interlocutory or permanent injunction[s]" against "any Act of Congress upon the ground that such Act or any part thereof is repugnant to the Constitution of the United States").

In 1948, Congress consolidated general references to the three-judge procedure into a single short chapter—Chapter 155—of the U.S. Code. *See* Act of June 25, 1948, ch. 646, 62 Stat. 968. Section 2281, mirroring the Act of 1911, barred single district court judges from issuing injunctions for constitutional reasons against state statutes. 28 U.S.C. § 2281 (injunction "upon the ground of the unconstitutionality of such statute") (repealed 1976). Section 2282, mirroring the Act of 1937, did the same for federal statutes. 28 U.S.C. § 2282 ("for repugnance to the Constitution of the United States") (repealed 1976). Sections 2281 and 2282 required that applications for such constitutional injunctions be "heard and determined by a district court of three judges under section 2284 of this title." *Id*. Section 2284 incorporated external statutory directives by noting that "any action or proceeding required by Act of

Congress to be heard and determined by a district court of three judges" would follow its procedures.[2] *Id.*

In 1976, Sections 2281 and 2282—related to constitutional injunction of federal and state statutes—were repealed. Concurrently, Section 2284 was amended to the current text now in dispute: "A district court of three judges shall be convened when otherwise required by Act of Congress, or when an action is filed challenging the constitutionality of the apportionment of congressional districts or the apportionment of any statewide legislative body." The first clause in the statute continued the function of Section 2284 as it had been since 1948—to ensure that three-judge courts required by an act of Congress would uniformly follow the congressionally-mandated procedures. The second clause of the statute, though narrowing the general requirement for three-judge courts to only apportionment challenges, is best read to otherwise reflect the historic constitutional focus of Sections 2281 and 2282 and their predecessors.

Thus, since the inception of the three-judge court, its convocation has been generally required only for constitutional challenges, or as otherwise specifically required by explicit directive in a separate statute. More than a century of statutory evolution underscores the consistency

---

[2] Such independent directives appeared, for instance, in a statute designed to expedite antitrust suits, Act of February 11, 1903, ch. 544, 32 Stat. 823; a statute providing for judicial review of orders of the Interstate Commerce Commission, Act of June 29, 1906, ch. 3591, 34 Stat. 584, 592; and (of special interest here) Sections 4, 5, and 10—but not Section 2—of the Voting Rights Act. Pub. L. 89-110, 79 Stat. 437 §§ 4(a), 5, 10(c) (directing actions pursuant to those subsections to be "heard and determined by a court of three judges in accordance with the provisions of section 2284 of title 28 of the United States Code").

of this approach, including in the modern Section 2284. The action in the district court was undisputedly a statutory one. The district court's decision "deal[t] only with the Section 2 claim." (Even though Intervenors now raise constitutional issues on appeal, that does not transform what was before the district court below.) Intervenors cannot, of course, point to any "Act of Congress" that requires actions under Section 2 of the Voting Rights Act to be undertaken by a three-judge court under the procedures of Section 2284. In the absence of such a congressional mandate, "a district court of three judges" under Section 2284 is not required for a statutory challenge to the apportionment of state legislative bodies.

No court has adopted Intervenors' reading. On the contrary, the Supreme Court has affirmed the judgment of a single-judge district court in a Section 2 challenge to a state legislative apportionment scheme. *See Allen v. Milligan*, 599 U.S. 1, 16 (2023) (noting that the actions involving constitutional challenges "were consolidated before [a] three-judge Court . . . while [a statutory challenge] proceeded before Judge Manasco on a parallel track"). There, as here, the single-judge district court had jurisdiction over the action.

## II.  Standing

We now assess whether Intervenors have standing to bring this appeal. Intervenors allege racial gerrymandering under the Equal Protection Clause of the Fourteenth Amendment, as well as vote dilution under Section 2 of the Voting Rights Act, and they challenge both the liability determination and the Remedial Map. "We consider [each Intervenor's] standing on a claim-by-claim basis." *Valley Outdoor, Inc. v. City of Riverside*, 446 F.3d 948, 952 (9th Cir. 2006).

### A. Standing as to the Liability Determination

Given the absence of traceability and redressability, none of the Intervenors has standing to challenge the liability determination.

Trevino, the voter who was re-sorted from LD 15 under the Enacted Map to the new LD 14 under the Remedial Map, alleges an injury of racial classification. In the context of a racial-gerrymandering claim, "racial classification itself is the relevant harm." *Alexander v. S.C. State Conf. of the NAACP*, 602 U.S. 1, 38 (2024). Trevino also alleges that he is suffering ongoing injury from "special representational harms" inflicted because of that classification. *United States v. Hays*, 515 U.S. 737, 745 (1995).

To sustain standing, Trevino's alleged injuries must be "fairly traceable to the judgment below"—that is, each judgment he challenges here: the liability determination and the injunction. *West Virginia v. EPA*, 597 U.S. 697, 718 (2022) (emphasis omitted) (quoting *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 433 (2019)). An injury is fairly traceable if "the links in the proffered chain of causation are not hypothetical or tenuous and remain plausible." *Idaho Conservation League v. Bonneville Power Admin.*, 83 F.4th 1182, 1188 (9th Cir. 2023) (quoting *Ass'n of Irritated Residents v. EPA*, 10 F.4th 937, 943 (9th Cir. 2021)).

Curiously, Intervenors have not provided any evidence that, in reaching its liability determination, the district court classified them based on their race. They barely argue that the determination classified anyone. After all, in racial classification cases, plaintiffs typically allege that "race predominated *in the drawing of a district*." *Alexander*, 602 U.S. at 38 (emphasis added). Trevino did not plausibly allege

that the district court, in determining that the Enacted Map violated Section 2, used race, classified Trevino by race, or treated him unequally based on his race. Nor has Trevino alleged that the liability determination "required [him] to do anything or to refrain from doing anything" because of his race or otherwise. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 385 (2024).

In the absence of evidence, Intervenors resort to the rhetoric that Trevino's injury is traceable to the liability determination, because racial classification is "inherent to Section 2 remedies" and so "inexorably" results from Section 2 liability determinations. We disagree.

While in many cases redistricting implicates racial considerations, those challenges rest on "unequal treatment," *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 228 (1995), or a constitutionally prohibited "use of race," *Miller v. Johnson*, 515 U.S. 900, 914 (1995); *see also* Stephen Menendian, *What Constitutes A "Racial Classification"?: Equal Protection Doctrine Scrutinized*, 24 Temp. Pol. & Civ. Rts. L. Rev. 81, 85 (2014) ("[I]t is the further *use* of [racial] classification . . . that generally raises constitutional concerns."). This general principle holds in the racial-gerrymandering context, where standing is accorded citizens who are "able to allege injury as a direct result of having personally been denied equal treatment." *Hays*, 515 U.S. at 746 (cleaned up). Even if it is possible to trace a racial-classification injury to a liability determination, Trevino has not done so, because he has not plausibly alleged that the specific method or substance of that determination somehow made race-based treatment in the remedial phase more likely. Because Trevino's alleged harm arose only from the alleged use of race in crafting the

Remedial Map and bears no connection to the liability judgment, he lacks standing to challenge the latter.[3]

Ybarra, the Washington state legislator, alleges two harms: increased campaign expenditures and reduced chances of reelection. At the time of this appeal, the 2024 election for the Washington state legislature had not yet occurred.

Ybarra's past harms do not support his standing. Because the Intervenors seek only prospective relief, harms Ybarra suffered in the 2024 election are past and cannot support his standing. Ybarra is not "seek[ing] a remedy that redresses [his] injury." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 282 (2021).

As for his alleged future harms, Ybarra has not demonstrated "a sufficient likelihood that he will again" potentially suffer increased campaign expenditures. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). He has not declared any intention of running again for state legislative office, and even if we could divine such an intent, Ybarra

---

[3] There are additional reasons to view Intervenors' traceability argument with skepticism. At the close of the liability phase, Trevino's assertions of future racial classification were purely speculative. As the State put it, "there were lots of ways the district court could have enacted a remedy that didn't affect Mr. Trevino in the slightest." Importantly, the district court's challenged resolution in the remedial process—the conduct giving rise to Intervenors' alleged harms—was not foreseeable or on the table at the time of the liability determination. Upon making its liability determination, the district court requested that the state redistricting commission take up the task of drawing a remedial map. The anticipated remedy flowing from the liability determination was a baton-pass to an independent decisionmaker. The liability finding was just that—striking down a portion of the map but with no resolution as to how the map would end up.

has provided no reason to believe that increased expenditures associated with meeting new constituents on an expedited timeline will persist. Constituents who were unfamiliar to him leading up to the 2024 election have since become familiar to him, and they will remain familiar in 2026 and beyond.

An unfounded concern regarding an unspecified future election, in which Ybarra may not even participate, does not allege a "real and immediate threat of repeated injury." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (en banc) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).

The claim that Ybarra's chances of reelection may be reduced does not support standing as to the liability determination, because it is not traceable to that judgment. Intervenors proffered hardly any chain of causation leading back to the liability order, let alone a "plausible" one. *Idaho Conservation League*, 83 F.4th at 1188. Ybarra's alleged electoral disadvantage—a 0.64% decrease in the Republican lean of his district, from 63.85% to 63.21%—flows from which constituents were subsequently sorted into and out of LD 13. The liability order had no assured impact whatsoever on LD 13. Nor did the order determine which of LD 13's constituents might be removed or which constituents from other districts might be added. Any chain of causation from the liability determination to Ybarra's injury is too tenuous to support standing.

Intervenors declined to defend the standing of Campos, the voter in LD 8. Unlike Trevino, Campos does not allege that he was resorted into a different district under the Remedial Map. Having provided no clue as to what harm he might have suffered, Campos does not have standing.

## B.  Standing as to the Remedial Map

Standing as to the Remedial Map also poses a roadblock for Intervenors. No Intervenor has standing to challenge the Remedial Map under Section 2. However, at least one Intervenor, Trevino, does have standing to challenge the Remedial Map under the Fourteenth Amendment.

### 1. No Intervenor has standing to bring a challenge against the Remedial Map under Section 2

Intervenors seek to challenge the Remedial Map as an illegal remedy under Section 2. We note at the outset that Intervenors have not brought their own Section 2 claim. In fact, Intervenors' Section 2 arguments contradict the heart of their position. Throughout this litigation, they have strenuously denied that Section 2 applies at all to the Yakima Valley—contesting every one of the district court's findings regarding the *Gingles* preconditions.[4] To now seek to utilize Section 2 is strange indeed. Even if their attempt is made in good faith, it fails.

Intervenors do not have a freestanding right to attack the district court's remedial decision. *See Diamond v. Charles*, 476 U.S. 54, 68 (1986). Because no other party joins them in

---

[4] The Court in *Thornburg v. Gingles*, 478 U.S. 30 (1986), developed a framework for evaluating claims brought under Section 2 of the Voting Rights Act. Plaintiffs alleging a Section 2 violation must first satisfy three "preconditions," *id.* at 50: first, whether the minority group is sufficiently compact and numerous to have "the potential to elect a representative of its own choice in some single-member district," *Growe v. Emison*, 507 U.S. 25, 40 (1993); second, whether the minority population has "expressed clear political preferences that are distinct from those of the majority," *Old Person v. Cooney*, 230 F.3d 1113, 1121 (9th Cir. 2000) (citation omitted); and third, whether the majority votes sufficiently as a bloc "usually to defeat the minority's preferred candidate," *id.* at 1122 (quoting *Gingles*, 478 U.S. at 51).

this appeal, Intervenors must demonstrate that they individually satisfy the requirements of Article III. *Id.*; *see also Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 64 (1997) (standing on appeal "in the place of an original defendant, no less than standing to sue, demands that the litigant possess a direct stake in the outcome" (internal marks and citations omitted)). As usual, Intervenors must make this showing claim-by-claim. *Valley Outdoor, Inc.*, 446 F.3d at 952.

Intervenors do not endeavor to justify their standing with respect to the Remedial Map. They have failed to adequately allege the only injury that supports a Section 2 claim. "Under [Section] 2, by contrast [to the equal protection context], the injury is vote dilution." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 433 (2006). At most, Intervenors merely imply an injury of vote dilution. The only evidence proffered tending to show vote dilution is that the Hispanic Citizen Voting-Age Population ("HCVAP") declined slightly, from 52.6% in the Enacted LD 15 to 50.2% in the Remedial LD 14. But a vote dilution claim in the redistricting context involves a holistic analysis of the relative opportunities for political participation of various groups, considering the specific political dynamics of a given region. Taken alone, the bare assertion of a marginally diminished group is not enough to show, let alone permit reasonable inference of any change in the effectiveness of any Intervenor's vote or other individualized disadvantage to any Intervenor's political participation. The Supreme Court has repeatedly reiterated that voters of a particular race cannot be assumed to "think alike, share the same political interests, [or] prefer the same candidates at the polls." *Shaw v. Reno* ("*Shaw I*"), 509 U.S. 630, 647 (1993). We decline to infer from Intervenors' allegations that the vote of Jose

Trevino, the only Intervenor who lives in the new LD 14, has been diluted merely because he is Hispanic and will now vote alongside fewer Hispanics.

### 2. At least one Intervenor has standing to bring an equal protection challenge against the Remedial Map.

Trevino's asserted racial-classification injury is a cognizable harm in the context of racial gerrymandering, as is any representational harm that may flow from such classification. *Alexander*, 602 U.S. at 38; *Hays*, 515 U.S. at 745. The alleged classification occurred when Trevino was "specifically moved from Enacted LD 15 to Remedial LD 14" under the district court's Remedial Map. Contrary to Soto Palmer's arguments, the standing analysis does not require us to decide whether the Remedial Map actually classified voters by race; that is a question left to analysis on the merits.

Trevino's grievance is sufficiently individualized under *Hays*, which requires only that the party reside in an allegedly racially gerrymandered district. 515 U.S. at 744–45. No one disputes that Trevino's change from one district to the other is traceable to the Remedial Map. And the remedy Trevino seeks—vacatur of the Remedial Map—could redress his ongoing representational harms as a registered voter in LD 14. *See Shaw v. Hunt* ("*Shaw II*"), 517 U.S. 899, 904 (1996) (concluding that registered voters and residents of a district subject to a racial-gerrymandering claim had standing to seek prospective relief). Trevino therefore has standing to bring an equal protection claim against the Remedial Map. Because Trevino has standing on this claim, we need not assess standing for either Ybarra or Campos. *Rumsfeld v. Forum for Acad. & Institutional Rts.,*

*Inc.*, 547 U.S. 47, 52 n.2 (2006) ("[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.").

## III.   Forfeiture

Although Trevino has standing to bring an equal protection challenge against the Remedial Map, he may have forfeited that challenge by failing to make it in the district court. It is well established that "we generally will not consider arguments raised for the first time on appeal, although we have discretion to do so." *In re Am. W. Airlines, Inc.*, 217 F.3d 1161, 1165 (9th Cir. 2000).

Intervenors argue that they preserved their equal protection challenge by asserting their Fourteenth Amendment rights in their statement of interest seeking intervention. Notably, that argument was not directed at the Remedial Map—not could it have been—because the map had not yet been drawn. Intervenors also claim that they made an equal protection argument at the evidentiary hearing on Map 3A, which the district court granted at Intervenors' request. But the hearing transcript reflects only one question about whether Soto Palmer's map-drawing expert "kn[e]w if [P]laintiffs' counsel consulted any racial or political data." Taken alone, this single inquiry is insufficient to preserve the equal protection argument.

At oral argument, Intervenors complained that they had little time to raise an equal protection argument during the remedial phase. In fact, they had plenty of opportunities. They could have raised the issue at the hearing on Map 3A, among their multiple written objections to Soto Palmer's map proposals, or as part of the presentation of their own alternative map. Even after the district court selected Map

3B as the Remedial Map, they could have moved to amend or set aside the judgment. But they did not.

That said, "[t]he matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton v. Wulff*, 428 U.S. 106, 121 (1976). There is "no general rule," but "a federal appellate court is justified in resolving an issue not passed on below . . . where injustice might otherwise result." *Id.* (internal marks and citation omitted). Despite the deficiencies in Intervenors' equal protection challenge, we recognize that this case is suffused with concerns about equal treatment under the law. In our view, given the nature of the challenge, an injustice might result from dismissal of this case without a substantive analysis of the equal protection claim as it pertains to the Remedial Map. We therefore turn to the merits.

## IV.   Remedial Map

Intervenors challenge the Remedial Map on several grounds, including their characterization that the map represents an unconstitutional racial gerrymander, an abuse of the district court's discretion, and a further dilution of Latino voting strength. These claims are ambiguously styled and could be construed as arguments under the Equal Protection Clause or Section 2. However, because Intervenors lack standing to bring a Section 2 challenge, we consider their arguments only under an equal protection framework.

To demonstrate that a map is an unconstitutional racial gerrymander, Intervenors must prove that "race was the predominant factor motivating the [map drawer's] decision to place a significant number of voters within or without a

particular district." *Cooper v. Harris*, 581 U.S. 285, 291 (2017) (quoting *Miller*, 515 U.S. at 916). Importantly, not all mentions of race trigger strict scrutiny, and the mere fact that the district court was "aware of racial considerations" does not indicate that the court was "motivated by them." *North Carolina v. Covington*, 585 U.S. 969, 978 (2018) (quoting *Miller*, 515 U.S. at 916).

If race predominated in the redistricting process, then "the design of the district must withstand strict scrutiny." *Cooper*, 581 U.S. at 292. Nothing in the record, however, supports a claim that race predominated in the redistricting process. To the contrary, the district court accomplished three distinct, non-racial objectives when it adopted a map that: (1) "starts with, and avoids gratuitous changes to, the enacted map while remedying the Voting Rights Act violation at issue"; (2) "keeps the vast majority of the lands that are of interest to the Yakama Nation together"; and (3) "is consistent with the other state law and traditional redistricting criteria." In particular, the map minimizes population deviations, maintains district compactness, and creates districts of contiguous, traversable territory that do not unnecessarily split counties, cities, or precincts. The Remedial Map stands.

## A. LD 14's Shape

The shape of LD 14 itself does not reflect that race predominated in the district court's construction of the Remedial Map. In Intervenors' view, the shape of LD 14 is so exceptional that it is "unexplainable-except-by-racial-grounds," and therefore presumptively unconstitutional. Indeed, we recognize that when a district is "so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting," strict

scrutiny applies. *Bush v. Vera*, 517 U.S. 952, 958 (1996) (quoting *Shaw I*, 509 U.S. at 642). No such irregularity triggers strict scrutiny here. Despite Intervenors' rhetoric denigrating LD 14 as an "octopus slithering along the ocean floor" akin to the "sacred Mayan bird" and "bizarrely shaped tentacles" in *Bush v. Vera*, LD 14's shape is neither unusual nor "extremely irregular on its face" as Intervenors suggest—and nowhere near as inexplicable as the districts in *Shaw* and *Bush v. Vera*. *Vera*, 517 U.S. at 958, 965, 974.

A visual review of LD 14 (Figure 1) reveals a district that, like many of the other districts in Washington, is essentially a large contiguous tract with only a small portion surrounding another district. In contrast, District 12 in *Shaw I* (Figure 2) was a noncompact squiggle that ran, like a river, directly through the middle of multiple other districts. Districts 18, 29 and 30 in *Bush v. Vera* (Figure 3) were similarly irregular, with complex, interlocking borders; narrow corridors; and strange protrusions. The districts' bizarre, noncompact shapes were evidence that Texas had "substantially neglected traditional districting criteria such as compactness, that it was committed from the outset to creating majority-minority districts, and that it manipulated district lines to exploit unprecedentedly detailed racial data." *Vera*, 517 U.S. at 962. The shapes of the three districts reflected an "utter disregard for traditional redistricting criteria" and were "ultimately unexplainable on grounds other than" race. *Id.* at 976 (addressing Districts 18 and 29); *see also id.* at 971 (discussing how District 30's shape similarly "reveal[s] that political considerations were subordinated to racial classification in the drawing of many of the most extreme and bizarre district lines"). The Texas districts look more like inkblots of a Rorschach test than legislative districts.



*Figure 1: Remedial Map 3A.*



*Figure 2:* The electoral map in *Shaw I*. 509 U.S. at 659 (App'x)
(District 12 colored in green).



*Figure 3*: Districts 18, 29, and 30 in *Bush v. Vera*. 517 U.S. at 986 (App'x A-C).

Here, unlike in *Shaw I* or *Vera*, rational, non-racial explanations readily support the shape of LD 14. Soto Palmer notes that the challenged protrusions were added to "include the Yakama Nation's off-reservation trust lands and fishing villages in the same district as its reservation" to address Intervenors' objection that the proposed map did not include off-Reservation trust land. To the extent LD 14's shape is in any way unusual, it is directly attributable to Intervenors' own requests during the remedial process–not to any improper racial considerations. In short, LD 14's shape alone does not subject it to strict scrutiny.

## B.  Alternative Maps

In equal protection challenges to redistricting plans, alternative plans can "serve as key evidence" of racial predominance. *Cooper*, 581 U.S. at 317. But the alternative maps here do not supply such proof.

Intervenors point to Plaintiffs' Maps 4 and 5 and their own map, offered by Dr. Trende, as evidence that the district court could have adopted a less disruptive map. Based on our review of the record, the district court carefully considered all proposed remedial maps and ultimately selected Map 3A

because it was most "consistent with traditional redistricting criteria. It seems to remedy the Voting Rights Act violation, even with a relatively low LCVAP. It keeps tribal lands together . . . and it avoids another cross-Cascade [mountains] district."

The district court's rejection of Maps 4 and 5 on the grounds of traditional redistricting principles does not suggest that the district court improperly considered race by adopting a variant of Map 3A. Significantly, the district court considered and rejected Intervenors' proposed map for failure to remedy the Section 2 violation.

For each of Intervenors' proffered alternatives, the district court rejected the alternative maps on race-neutral grounds. The district court's thoughtful attention to the details of the maps, population and voter numbers, and viable alternatives does not furnish evidence of racial predominance. Instead, it confirms that race was not the predominant factor in shaping the map.

## C. Intent to Remedy Section 2 Violation

Finally, the record does not otherwise support a claim that "race was the predominant factor motivating the [map drawer's] decision to place a significant number of voters within or without a particular district." *Cooper*, 581 U.S. at 291 (quoting *Miller*, 515 U.S. at 916). We acknowledge that "[a]pplying traditional equal protection principles in the voting-rights context is 'a most delicate task.'" *Shaw II*, 517 U.S. 899, 905 (1996) (quoting *Miller*, 515 U.S. at 905). And we are especially cognizant of our obligation to "exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Miller*, 515 U.S. at 916. The "[Supreme] Court has long recognized," however, "[t]he distinction between being aware of racial

considerations and being motivated by them,'" *Covington*, 585 U.S. at 978 (quoting *Miller*, 515 U.S. at 916). The mere mention of race is not enough to trigger strict scrutiny. Race must be more than "*a* motivation" to trigger strict scrutiny; it must be "the *predominant* factor," "subordinating traditional race-neutral districting principles to racial considerations." *Easley v. Cromartie*, 532 U.S. 234, 241 (2001) (cleaned up). Although this map was configured by the district court and not the state legislature, we afford the same "presumption of good faith" to the district court. *Miller*, 515 U.S. at 916.

Intervenors identify two points in the district court proceedings that supposedly demonstrate race's predominance in the decision-making: first, the district court's recognition that a "fundamental goal of the remedial process" is to "unite the Latino community of interest in the region," and second, the district court's rejection of Intervenors' proof-of-concept map because it failed to unite the Latino community in the Yakima Valley.

These references are far from sufficient to show that race predominated. The Supreme Court has distinguished between racial classification and the unification of "tangible communities of interest." *Miller*, 515 U.S. at 919 (internal marks and citation omitted). As the Court counseled: "A State is free to recognize communities that have a particular racial makeup, provided its action is directed toward some common thread of relevant interests." *Id.* at 920. That is precisely what the district court did here. Experts testified that communities in the larger Yakima Valley were dependent on the agriculture and dairy industries, had large Spanish-speaking and first-generation populations, shared housing access issues due to substandard and overcrowded farmworker housing, and shared common migration patterns

and historical experiences of racism in the region. Unlike in *Miller*, where "[a] comprehensive report demonstrated the fractured political, social, and economic interests" of the minority population, here, the Latino community in the Yakima Valley evinces the "common thread of relevant interests" rendering it a "tangible communit[y] of interest." *Id.* at 919–20 (internal marks and citation omitted). An intent to unify that political community is not tantamount to a predominantly racial motivation.

Even if race—as distinct from belonging in a political community—were "*a* motivation" in the district court's actions, which it was not, that motivation alone would not trigger strict scrutiny. The touchstone is whether race predominates in shaping the configuration. In *Cromartie*, the Court held that a map drawer's direct admission that a challenged redistricting plan sought "racial balance" in a congressional delegation, even if it "shows that the legislature considered race, along with other partisan and geographic considerations . . . "sa[id] little or nothing about whether race played a *predominant* role comparatively speaking." 532 U.S. at 253 (emphasis in original).

To bring that point home, in *Miller*, the record supported a finding of racial predominance where the state admitted that certain counties would not have been excluded or included "*but for* the need to include additional black population in that district," and that the need to create majority-black districts required the state to "violate all reasonable standards of compactness and contiguity." 515 U.S. at 918–19 (emphasis added) (cleaned up). Here, in contrast, the district court considered traditional, race-neutral districting principles throughout the remedial process, including minimizing total population deviation; ensuring the reasonable shape, compactness, and contiguity

of affected districts; keeping together the lands of interest to the Yakama Nation; and maintaining partisan competitiveness of the impacted districts. The district court did not subordinate these race-neutral redistricting principles to race when it drew the Remedial Map.

### D. Intervenors' Other Arguments

Intervenors' remaining objections to the Remedial Map do not support a claim that race predominated. Intervenors now contend that too many Washingtonians were moved into new districts, that the Remedial Map's partisan composition now favors Democrats, and that incumbents were harmed.

We begin by noting that the factual record furnishes only limited support for Intervenors' objections, which are, in any case, not germane to the issue of racial predominance. For instance, Intervenors claim that 500,000 of Washington's approximately 7.7 million residents were moved into new districts, whereas Plaintiffs suggest that the number is nearly 100,000 fewer. Intervenors also assert that the Remedial Map was drawn to benefit Democrats, whereas both Plaintiffs and the district court note that the Remedial Map "confer[red] no gain or loss to any party beyond LDs 14 and 15, and the overall partisan tilt of the legislative map remains slightly Republican, just as in the enacted plan."

But even accepting Intervenors' view of the facts, these arguments, which center on the political lean of the new LD 14, are not obviously relevant to Intervenors' claim that the Remedial Map was an illegal racial gerrymander. They are objections based on partisanship, not race. The equal protection challenge is grounded in race, not partisanship.

Intervenors' remaining arguments—that the Remedial Map improperly lowered the HCVAP of LD 15 from 51.1% to 50.2% (based on the 2021 census), that LD 14 is an improper coalition or crossover district, and that the Remedial Map altered too many districts to remedy the Section 2 violation—also do not bear on the question of whether race predominated in the district court's redistricting process.

### Conclusion

The district court properly exercised jurisdiction over the challenge to the Remedial Map. Section 2284 does not require a three-judge court for a statutory challenge to redistricting under the Voting Rights Act. Although Intervenors lack standing to appeal the liability finding and lack standing as to the Section 2 claims under the Voting Rights Act, they have standing to challenge the Remedial Map on equal protection grounds. The appeal of the liability order is dismissed for lack of jurisdiction. The appeal of the remedial order and judgment is also dismissed for lack of jurisdiction, except for Intervenors' equal protection claims, as to which we affirm the district court. Intervenors shall bear the costs of appeal.

**AFFIRMED IN PART and DISMISSED IN PART FOR LACK OF JURISDICTION.**